**Clint BOLICK, et al., Plaintiffs,**

v.

**Clarence ROBERTS, et al., Defendants.**

**No. 3:99CV755.**

United States District Court,
E.D. Virginia,
Richmond Division.

March 29, 2002.

400

Matthew Scott Hale, Law Office of Matthew Hale, Newport News, VA, Channing Moore Hall, III, Hale & Hale, PLLC, Williamsburg, VA, Michael Paul Thomas, Law Offices of Michael Paul Thomas, APC, Newport Beach, CA, Daniel R. Ortiz, Charlottesville, VA, for plaintiffs.

George Walerian Chabalewski, Office of Atty. Gen., Richmond, VA, Barbara Joan Gaden, Barbara J. Gaden, LLC, Richmond, VA, William Henry Hurd, Office of Atty. Gen. of VA, Richmond, VA, for Clarence W. Roberts, Sandra Canada, Clater Mottinger, defendants.

Walter A. Marston, Jr., Samuel Miles Dumville, Reed Smith Hazel & Thomas, LLP, Richmond, VA, Ernest Gelhorn, Washington, DC, Lee A. Rau, Reed Smith Shaw & McClay, LLP, Washington, DC, for Virginia Wine Wholesalers Ass'n, Inc., defendant.

William B. Gair, Porter & Gair, PC, Fairfax, VA, for Virginia Vineyards Ass'n, movant.

Melanie Diana Coates, Wilmer, Cutler & Pickering, Washington, DC, for Wine and Sprits Wholesalers of America, Inc., amicus.

Mary Chlopecki, Law Office of Douglas C. Herbert, Washington, DC, William Charles Kinzler, Benicia, CA, for Coalition for Free Trade, amicus.

### MEMORANDUM OPINION

RICHARD L. WILLIAMS, Senior District Judge.

Plaintiffs Clint Bolick and Robin Heatwole, individual consumers of wine, beer and distilled spirits, and plaintiffs Dry Comal Creek Winery, Miura Vineyards, and Hood River Vineyard, all out-of-state growers and producers of wine, brought this action against the defendants, Clarence Roberts, Sandra Canada, and Clater Mottinger, in their official capacities as appointed members of the Virginia Alcoholic Beverage Control Board (ABC Board or Board), challenging Virginia's regulatory scheme involving the shipment and distribution of alcoholic beverages. The plaintiffs' causes of action properly invoke this Court's federal question jurisdiction under the United States Constitution and relevant statutes, 42 U.S.C. §§ 1983, 1988 and 28 U.S.C. §§ 2201, 2202. The Virginia Wine Wholesalers, Inc. intervened as a

defendant. Pursuant to United States Code Title 28, Section 636(b)(1)(A) and (C), and Federal Rule of Civil Procedure 72, the matter was referred to the United States Magistrate Judge for the handling of all pretrial motions. On July 27, 2001, the United States Magistrate Judge issued a Report and Recommendation addressing the various motions. The proposed opinion of the Magistrate Judge is attached hereto as an addendum.

## I. PROCEDURAL HISTORY

The parties were given notice that they could file objections to the Report and Recommendation and were granted until August 29, 2001 to file any such objections. Plaintiffs, defendants and intervenor filed objections on August 29, 2001. Also on August 29, 2001, the plaintiffs filed objections to the Magistrate Judge's Order of July 27, 2001, regarding non-dispositive evidentiary motions. Those objections were overruled by Order of this Court on October 4, 2001. On August 30, 2001, the Virginia Wineries and Vineyards Associations filed a motion for leave to enter as amicus curiae, which was denied by Order of this Court on October 4, 2001.

## II. STANDARD OF REVIEW

"The magistrate makes only a recommendation to this court. The recommendation has no presumptive weight, and the responsibility to make a final determination remains with this court." *Estrada v. Witkowski*, 816 F.Supp. 408, 410 (D.S.C. 1993) (citing *Mathews v. Weber*, 423 U.S. 261, 270–71, 96 S.Ct. 549, 46 L.Ed.2d 483 (1976)). This Court "shall make a *de novo* determination of those portions of the report or specified proposed findings or recommendations to which objection is made." 28 U.S.C. § 636(b)(1)(C). "The filing of objections to a magistrate's report enables the district judge to focus attention on those issues—factual and legal—that are at the heart of the parties' dispute." *Thomas v. Arn*, 474 U.S. 140, 147, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985).

## III. ANALYSIS

### A. OBJECTIONS TO THE REPORT'S STATEMENTS OF MATERIAL FACTS NOT IN DISPUTE

A motion for summary judgment must be decided on undisputed material facts and reasonable inferences therefrom. In this case, deciding whether one party is entitled to judgment as a matter of law requires the Court to determine, based on the standards set forth by the Supreme Court and relevant Fourth Circuit precedent, whether certain of Virginia's ABC statutes violate the dormant Commerce Clause. As the Magistrate's Report makes clear, the challenge in this case is to the statutory scheme for regulating alcohol in Virginia. The Magistrate's Report outlines certain "Material Facts Not in Dispute" in order to place the nature of the parties' dispute in proper context. All parties have made objections to the findings of material facts. Although none of the parties' objections to these material facts create a "genuine issue of material fact" that would affect the outcome of the case or preclude summary judgment, the Court will nonetheless address each of them, sustaining some and overruling others, in order to provide a more complete record.

#### 1. Defendants' and Intervenor's objections

The defendants and intervenor numbered each paragraph of their objections and the Court will refer to the objections by paragraph number.

a. The defendants and intervenor argue that the Magistrate's Report omits evidence relating to the purpose, structure, operation and practical effect of the ABC Act which, if included, would show that the authority of licensed Virginia wine and beer producers to sell and ship beer and wine to consumers is subject to the same obligations and bears the same burdens as imposed on the importation of out-of-state products.

■ The objections in defendants and intervenor's paragraph 1 deal with certain specific sections of the Virginia Code dealing with excise taxes and importation. How and when excise taxes are due and that importation must be to a Virginia licensed entity may be undisputably governed by Va.Code Ann. §§ 4.1–235–236; 207(3), 208(3), but that does not diminish the impact of whether there is a state statute that permits direct shipment of beer and wine by in-state entities and prohibits direct shipment by out-of-state entities. Furthermore, the report contains citation to the entire ABC Act in its findings (*See* Report and Recommendation of the Magistrate Judge (R & R) ¶ 2 at 5) and importation sections are discussed throughout the report. Collection of excise taxes is an important function of the ABC, and while the questions of how the market will apportion the state excise taxes among participants and how it affects consumer choice are interesting, they are not questions that need to be answered considering the confines of the dormant Commerce Clause analysis. Further, considering the constitutional proscription on taxation of transactions which are wholly interstate in nature, the Commonwealth could not collect excise taxes from out-of-state entities for delivery directly to Virginia consumers. *Quill Corp. v. North Dakota*, 504 U.S. 298, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992). Finally, this objection raised by the Defendants and Intervenor points directly to issues recognized in the report. For instance, the report adequately notes that there is no proscription on the importation of out-of-state alcohol products provided they first pass through a Virginia licensed importer. (R & R ¶ 11 at 6). Therefore, this objection by the defendants and intervenor is overruled.

In paragraph 2, the defendants and intervenor seek to include information about requirements for obtaining a license to manufacture alcohol within the Commonwealth of Virginia. A dormant Commerce Clause analysis requires a plaintiff to show that a statute or statutory scheme is facially or functionally discriminatory and it requires the defendant to show it has a legitimate purpose that can be accomplished by no other nondiscriminatory means. It is relevant to consider the code provisions that establish these elements. To the extent that the Report fails to adequately explain that a manufacturer seeking a Virginia license must be sited in Virginia and that it must meet stringent corporate bookkeeping and management guidelines, the objection in defendants' and intervenor's paragraph 2 is well taken and is sustained.

Likewise, to the extent that the Report fails to adequately explain the statutory entitlements of the Virginia farm winery, brewery, and winery licensees, as outlined in paragraph 3 of the defendants' and intervenor's objections, the objection in paragraph 3 is sustained.

In their paragraph 4, the defendants and intervenor object to the facts contained in the Report regarding physical segregation of products at Virginia licensees. Because

the Magistrate's Report adequately addresses this issue in its findings, and because the specificity raised by the defendants' and intervenor's objection, while perhaps not in dispute, is of no relevance, the objection in paragraph 4 is overruled.

■ In the objections in paragraphs 5 through 9, the defendants and intervenor urge the Court to consider facts relating to regulation, taxation, enforcement, inspection and monitoring of licensees, producers, wholesalers and retailers. Paragraph 10 urges the Court to consider undisputed facts relating to the extent to which Virginia breweries, wineries and farm wineries direct-ship to consumers. Paragraph 11 complains that there is no evidence that the cost of complying with ABC regulations is higher or lower for in-state producers. None of the facts urged in these paragraphs is material to the resolution of this case. In a case of facial discrimination, the Court need not consider the quantum of the economic impact on either the instate or out-of-state entities. *New Energy Co. of Ind. v. Limbach,* 486 U.S. 269, 277, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988) (citing cases). Therefore, the objections in defendants' and intervenor's paragraphs 5 through 11 are overruled.

In paragraphs 12 and 13, the defendants and intervenor object that the Magistrate's Report does not list the number of licensed wineries, importers, wholesalers, distilleries, on-and off-premises licensees, the incoming shipments, investigations, and enforcement actions by the ABC. While it is not clearly relevant, there is no dispute as to these facts and the information may be considered helpful to the defendants' and intervenor's argument that there are no other nondiscriminatory means to accomplish the legitimate functions served by Virginia's statutory scheme. Therefore, the objections in paragraphs 12 and 13 are sustained.

b. **The defendants and intervenor argue that the Magistrate's Report omits undisputed facts which, if included, would show that Virginia's import controls relate directly to core 21st Amendment interests of the state, including: preventing illegal diversion of alcohol imports; discouraging the abuse and misuse of alcoholic products; collecting excise and sales taxes; and eliminating the bootlegger by tracking and controlling the importation and distribution of beer and wine to thousands of retail licensees.**

The Court has reviewed each and every exhibit proffered by the defendants and intervenor in connection with their motion for summary judgment together with the undisputed material facts upon which the Magistrate Judge relied. The information that the defendants and intervenor present in paragraphs 14, 18, and 19, regarding the ABC regulations for importation of wine and beer, the history of the regulations and policy regarding imports, and the records maintained by the ABC Board, is adequately addressed in the Magistrate's Report. The objections in these paragraphs are therefore overruled.

In paragraphs 15 through 17, the defendants and intervenor present facts relating to the number of shipments of wine and beer in the fiscal year 2000 and the amount of excise taxes collected in that year, as well as statements regarding underage consumption and abuse of alcohol. These matters are irrelevant to resolving the dormant Commerce Clause question in this case and the objections outlined in paragraphs 15 through 17 are therefore overruled.

c. **The defendants and intervenor make the objection that many of the statements of material fact included in the Magistrate's Report inaccurately reference or make material omissions regarding critical provisions of state and federal law.**

The Court has reviewed each of the defendants' and intervenor's arguments and assignments of error outlined in objection paragraphs 20 through 26. The Federal Alcohol Administration Act and Senate Document No. 5 are relevant to the resolution of this case; however, the Court notes that the Magistrate's Report contains sufficient detail and citation to the relevant state and federal statutes as well as to Senate Document No. 5. It would be ridiculous to require every court to enumerate every sentence of each of these acts. It is sufficient to provide adequate citation to and analysis of relevant provisions. The defendants' and intervenor's complaints that the Report "incompletely describes the tree-tier control system" and that particular findings are "unclear or inaccurate" are without merit. The Magistrate's Report cites and analyzes the relevant laws and the defendants' and intervenor's objections in paragraphs 20 through 26 are overruled.

### 2. Plaintiffs' Objections

As to the material facts, plaintiffs outlined their objections by referencing the paragraph numbers in the Report's section of "Material Facts Not in Dispute." The Court, therefore, addresses them in the same manner.

a. **Plaintiffs argue that certain facts included in the Report need to be corrected or omitted.**

Similar to the defendants and intervenor, the plaintiffs object to certain of the material facts in the Magistrate's Report regarding the summary, quoted portions, or citation to certain Virginia and federal statutes contained in the Report. The Court has reviewed the plaintiffs' objections and addresses each as follows.

The plaintiffs object to the Report's first statement of material fact, arguing that it misstates the Federal Alcohol Administration Act by stating that "purchasers for resale" must have an ATF basic permit, when it is only "purchasing for resale at wholesale" for which a permit is required. The Court notes that the Report's citation to the statute speaks for itself, however the plaintiffs are correct as to the exact words of the statute, and their objection is sustained.

Plaintiffs object to the statements of fact in paragraphs 4, 22, 23, 24, 26, and 28 of the Report, arguing that these statements, while accurate, are not material. Plaintiffs are correct that a "material" fact is one that has the potential to "affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The facts objected to by plaintiffs as immaterial include references to record keeping requirements, alcohol content by volume of liquor, beer, and wine, the relationship of federal funds and states' minimum drinking ages, and federal and private grant money. The Court agrees that these matters are not material to the outcome of this case and need not be included. Therefore, plaintiffs' objection on this point is sustained.

Plaintiffs object to the Report's statement of fact number 7, which states that retail off-premises winery and beer licensees are authorized to ship products directly to purchasers both inside and outside of Virginia in accordance with Board regulations. Plaintiffs argue that this statement is incorrect, asserting that shipments may be made only inside of Virginia. The Court finds that the statute does not

limit shipment within the Commonwealth, but rather limits it to that authorized by the Board regulations. This objection by the plaintiffs is overruled.

Plaintiffs object to the Report's statement of fact number 8, arguing that it is misleading in its inclusion of the phrase, "but all out-of-state wine sources must ship their product to a licensed wholesaler or other licensee." Plaintiffs correctly state that when purchasing other than Virginia-produced wines, wholesalers in Virginia must deal only with licensed importers regarding the purchase of wine produced outside of the Commonwealth bought for resale pursuant to the statute, which reads:

> No wholesaler wine licensee shall purchase wine for resale from a person outside the Commonwealth who does not hold a wine importer's license unless such wholesale wine licensee holds a wine importer's license and purchases wine for resale pursuant to the privileges of such wine importer's license.

Va.Code Ann. § 4.1–207(2). While the result is the same if the licensee receiving out-of-state products also holds an importer's license, the plaintiffs' objection to this paragraph of the Report is well-taken and is therefore sustained.

Plaintiffs object that in paragraph 9, the statement that Virginia's ABC stores may sell only Virginia-produced wine is incorrect. To the extent that the Report is unclear that the ABC stores sell strictly Virginia *farm* wines as opposed to all Virginia wines, plaintiffs' objection is sustained.

■ Plaintiffs object to the Report's use of the word "consigned" in statement of fact number 11. The Court finds that this objection is without merit, although the Court notes that "sale by consignment" and "to consign" may be distinct terms of art. It is prohibited by 27 U.S.C. § 205(d) for alcoholic beverages to be sold by the practice of consignment sales, defined as "a transaction in which goods are delivered by a consignor to a dealer or distributor (the consignee) primarily for sale by the consignee, and the consignee has the right to return any unsold commercial units of the goods in lieu of payment." *Malone v. Microdyne Corp.*, 26 F.3d 471, 476, n. 6 (4th Cir.1994). To consign a good simply means to transfer it. Black's Law Dictionary 303 (7th ed.1999). Plaintiffs' objection to this paragraph is overruled.

Plaintiffs next argue that the statement of fact number 12 makes incomplete reference to licensing restrictions. The Report makes sufficient reference to Virginia Code section 4.1–223 to overcome this objection, but because the licensing restriction is important to the Magistrate Judge's and this Court's reasoning with respect to the finding of discrimination, plaintiffs objection is sustained. The Court agrees that the more correct statement is that an out-of-state entity cannot obtain a Virginia wholesale or import license. This, of course, creates a barrier to out-of-state participation by direct shipment in Virginia.

Plaintiffs object that statement of fact number 14 incorrectly assumes a disputed fact by stating that the Federal Alcohol Administration Act was designed to promote temperance. The Court agrees with the plaintiffs in this respect, but the Court does not go so far as to agree with plaintiffs' assertion that the Act was "designed to preclude consumer deception as well as vertical integration," although the Court recognizes that two courts have found consumer deception and vertical integration to be among the concerns of the Act. (*See,*

*e.g., Taylor Wine Co., Inc, v. Dept. of Treasury,* 509 F.Supp. 792 (D.D.C.1981)); *Levers v. Berkshire,* 151 F.2d 435 (10th Cir.1945). To the extent that it is relevant, the statute speaks for itself in this regard. The plaintiffs' objection is sustained.

Plaintiffs object that statement of fact number 15 is incomplete in failing to more completely quote the statutory requirements. Although the Court notes that the Report's citation to the statute is sufficient, plaintiffs' objection is sustained as it is a more complete statement of the relevant statute that, "[i]t is a misdemeanor criminal offense for any entity to ship alcoholic beverages into Virginia to other than an entity licensed by Virginia to receive it." Va.Code Ann. § 4.1–310.

Plaintiffs object that statement of fact number 16 is incorrect for the same reason they objected to statement number 9, that the Report refers to "Virginia-produced wine" and should more accurately refer to "Virginia-produced *farm* wine." Consistent with the Court's ruling on the objection to statement number 9, plaintiffs' objection to statement number 16 is sustained.

**b. Plaintiffs argue that certain additional material facts should be included as relevant to the Court's analysis.**

The Court has reviewed all fifteen of the "material facts" that the plaintiffs proffer. The Court concludes all are immaterial or improperly offered, particularly those which relate to any affidavits offered by counsel. Therefore, the plaintiffs' objections regarding inclusion of additional facts not specifically stated in the Report are overruled.

**B. OBJECTIONS TO THE REPORT'S ANALYSIS AND APPLICATION OF THE TWENTY–FIRST AMENDMENT AND FEDERAL STATUTES**

**1. Defendants' and intervenor's objections**

**a. Defendants and intervenor object to the Magistrate's finding of facial and economic discrimination.**

**i. Defendants and intervenor argue that the ABC Act's import controls are facially neutral because whether manufactured in- or out-of-state, all liquor must pass through the hands of a state-licensed entity.**

■ The Court has reviewed the statutes in question and finds that this objection must be overruled. Regardless of defendants' and intervenor's characterization of the statutes, on its face, the scheme establishes a system whereby Virginia wineries, farm wineries, breweries, and off-premises licensees may directly ship beer and wine to Virginia and out-of-state consumers, where legal, whereas out-of-state vendors may neither obtain a Virginia license nor directly ship beer or wine to Virginia consumers. This is the very definition of a facially discriminatory law and the defendants' and intervenor's objection stated in paragraph 27 is therefore overruled.

**ii. Defendants and intervenor argue that the ABC Act's import controls do not constitute "economic discrimination."**

■ In paragraph 28, the defendants and intervenor assert that the Magistrate's Report is in error, arguing that state imposed burdens on in-state licensed producers are identical to the burdens placed on out-of-state producers. The Court finds this objection to be without merit. The

Virginia scheme does not place the *same* burdens on in-state and out-of-state producers because it allows in-state producers and off-premises licensees to not only obtain licenses, but also to directly ship products to Virginia and out-of-state consumers while it is impossible for an out-of-state entity either to direct ship or to obtain a Virginia license. The scheme has both the purpose and effect of prohibiting an out-of-state entity from participating in direct marketing and shipment of wine and beer to Virginia residents. In fact, throughout most of this case, it is apparent that the defendants and intervenor have been trying to convince the Court that the in-state entities bear a greater burden than do the out-of-state entities simply because the ABC has physical jurisdiction under Virginia's regulatory scheme. The objection made by defendants and intervenor in their paragraph 28 that the "formal distinction between requiring that imports pass through wholesale and retail licensees while permitting licensed in-state producers to sell to consumers creates no separate economic effect and thus cannot constitute economic discrimination because all are subjected to the same regulations" is disingenuous. The regulations prevent out-of-state products from entering the market on the same terms as in-state products because they must go to a Virginia wholesaler and/or off-premises licensee before reaching a consumer. A Virginia producer may obtain its off-premises license, market directly to consumers, ship directly to consumers, and eliminate any requirement to pass its product through any other mechanism other than its own production and distribution line. The objection in defendants' and intervenor's paragraph 28 is therefore overruled.

In paragraph 29, defendants and intervenor argue that the Seventh Circuit's decision in *Bridenbaugh v. Freeman–Wilson,* 227 F.3d 848 (7th Cir.2000), is persuasive and supports their argument that Virgi-

nia's statutory system does not constitute economic discrimination. The Court agrees with the Magistrate's analysis that the *Bridenbaugh* case is inapplicable to this case and also improperly decided because it does not rely upon the established dormant Commerce Clause analysis. Although the dormant Commerce Clause jurisprudence may be unpopular among some jurists and litigants, it is the law by which this Court is bound. The defendants' and intervenor's objection stated in paragraph 29 is therefore overruled.

In paragraph 30, defendants and intervenor object to the Magistrate's finding of economic discrimination on the theory that the finding was based on a fundamental misunderstanding of the structure and operation of Virginia's control system. Defendants and intervenor complain that the Report's conclusion that the ban against out-of-state direct shipment is against the evidence because Virginia's producers and in-state licensees bear the costs of compliance with Virginia's laws, including the payment of excise taxes. They argue that because out-of-state entities do not have to comply with Virginia's laws and are permitted to direct-ship, the cost of delivering out-of-state products to Virginians directly would actually be lower than for Virginia producers and in-state licensees. Considering the Virginia enforcement scheme, the relevant inquiry is whether the in-state entities and out-of-state entities are permitted to enter and compete in the market on the same terms. Here, it is not disputed that in-state entities properly licensed may direct-ship to consumers while out-of-state entities may neither obtain a license nor direct-ship.

The Court finds, however, that there is some merit to the defendants' and intervenor's objection that the Magistrate's Report assumes, and therefore finds, that the actual discrimination is based on two mis-

takes of fact: 1) that the in-state preference avoids a price increase; and 2) that the "degree of control that is exercised under the state's authority of inspection in regard to the in-state preference is significantly less than what exists in regard to the full force of the three-tier system that applies to all out-of-state sources." First, the actual discrimination occurs as a result of the in-state preference for entry into the market and direct shipment to consumers; it is based on the language and function of the ABC Act. Because it is unnecessary to measure the quantum of the economic impact to determine whether the statute is facially discriminatory, the statement that the in-state preference avoids a price increase is superfluous whether supported by the evidence or not. Second, the record demonstrates that the "three-tier" system is a misnomer when applied to in-state producer/licensees. It is accurate to state that in-state producer licensees do not have to pass their products through each tier that an out-of-state entity must. Because it is clear that in-state producers/licensees are subject to the same enforcement provisions, it may not be accurate to find that they are subject to significantly less control by the state.

While the Court does not accept the defendants' and intervenor's characterization of the objection in paragraph 30, it does have some merit. Therefore, the objection to the finding that the in-state preference necessarily results in a price increase is sustained, but only to the extent that it is an unnecessary finding. Further, the objection to the finding that in-state producers/licensees are subject to significantly less control is also sustained in part. The appropriate finding is that off-premises licensees who are also producers and importers may not be required to pass the product through a wholesaler or retailer to deliver the product to consumers, and thus they are subject to less than the full-force and exposure of the three-tier system.

**iii. Defendants and intervenor object to the Magistrate Report's findings related to the dormant Commerce Clause analysis, alleging that the factual record demonstrated that the importation controls were justified and that the controls are the least restrictive controls available.**

█ In paragraph 31, defendants and intervenor complain that the Report erroneously concluded that the defendants failed to produce "any meaningful evidence which the Court can accept as creating a genuine issue of material fact regarding any justification for the discriminatory policy." The argument is that the Magistrate should have found that Virginia's justification for its controls were the only means by which it could inspect, monitor, and regulate out-of-state products given the volume of imports and the limited jurisdiction of the ABC within the state. The defendants and intervenor produced mounds of evidence relating to their business practices and enforcement activities. They also produced evidence that there were violations of practically every state law by both in- and out-of-state entities. However, they did not produce evidence tending to show that there are no other nondiscriminatory means of enforcing their legitimate interests. The question is not whether the state can perform the type of enforcement in which it currently engages or whether is the three-tier system per se the only framework for consideration of a system by which it can function. The question is whether the state can accomplish its legitimate interests without discriminating against out-of-state direct shippers of wine and beer. This, they have not done. *See Waste Mgmt. Holdings, Inc. v. Gilmore*, 87 F.Supp.2d 536, 543 (E.D.Va.2000). The defendants' and intervenor's objection in paragraph 31 is therefore overruled.

### b. Defendants' and intervenor's objections regarding application of the Twenty-first Amendment.

### i. Defendants and intervenor argue that the Twenty-first Amendment immunizes state controls on the importation, distribution, and transportation of alcoholic products from challenge under the dormant Commerce Clause.

■ In paragraphs 32 through 39, defendants object to the Magistrate Judge's application of the Twenty-first Amendment. The defining feature of defendants' and intervenor's argument is that the Twenty-first Amendment, and not the dormant Commerce Clause, is the only means by which the Court should analyze whether Virginia has the authority to control the importation and distribution of alcoholic beverages "free of the strictures of the dormant Commerce Clause." They argue that no Supreme Court case has ever applied the dormant Commerce Clause to a case which focused strictly on imports, and that the state's control over importation and distribution is unfettered. Therefore, the defendants and intervenor object to the mere fact that the Magistrate Judge applied the dormant Commerce Clause analysis to this case. In addition to objecting to its relevance to this case, the defendants and intervenor also object to the Magistrate Judge's interpretation of the dormant Commerce Clause analysis and the manner in which it was applied to the facts of this case. The defendants and intervenor narrowly focus their argument and interpretation of the dormant Commerce Clause only in the context of the nature of the violation—that Virginia's import controls include a ban on direct shipment of out-of-state beer and wine to Virginia consumers while permitting such shipment by Virginia entities. Rather than focus on this case as an import case, the Magistrate's Report analyzed the challenged statutes under the dormant Commerce Clause by determining first whether the statute was facially discriminatory. Because the question in this case required application of the dormant Commerce Clause analysis, and because the Court agrees with the Magistrate's analysis in this respect, the defendants' and intervenor's objections outlined in their paragraphs 32 through 39 are overruled.

### ii. Defendants and intervenor assign error to the Magistrate's rejection of circuit court decisions upholding state import control statutes.

In paragraph 40, the defendants and intervenor object to the Magistrate's rejection of the Seventh Circuit's decision in *Bridenbaugh v. Freeman–Wilson*, 227 F.3d 848 (7th Cir.2000). This Court is not bound by any decision of the Seventh Circuit, and the Court agrees with the Magistrate Judge's analysis of this case. The defendants' and intervenor's objection is overruled.

In paragraph 41, the defendants and intervenor object to the Magistrate's differentiation between the statutory scheme in Indiana, addressed in the *Bridenbaugh* decision, and the scheme in Virginia. There is some merit to the observation that the burdens imposed on in-state and out-of-state producers under the Virginia ABC Act for compliance and taxation are "identical in economic or functional impact." The Court finds, however, that the *Bridenbaugh* decision is inapplicable for other reasons outlined by the Magistrate's Report, namely that the Seventh Circuit did not apply the dormant Commerce Clause, which this Court finds must be applied. Therefore, the objection is overruled.

In paragraph 42, defendants and intervenor object to the Magistrate's assertion that Virginia's scheme can be differentiated from that in *Bridenbaugh* because Vir-

ginia's three-tier system applies differently depending on whether the producer is in- or out-of-state. As previously discussed, the Magistrate found that Virginia's scheme allows Virginia producers and off-premises licensees to direct ship wine and beer to Virginia and out-of-state consumers where permitted by law. Thus, these licensees are not truly subject to the full-force of the three-tier system, meaning that they are spared the requirement to pass products through each tier. Though Virginia wineries, farm wineries, breweries and off-premises licensees must all be residents of Virginia to obtain a license and all licensees are subject to compliance, taxation and enforcement at all tiers, the Magistrate's conclusion is correct that the Virginia scheme is discriminatory because it: 1) does not permit out-of-state entities to obtain Virginia licenses; and 2) forbids out-of-state licensed or federal licensed entities to direct-ship products to Virginia consumers, instead requiring delivery of the product first to a wholesaler or Virginia-licensee before that licensee can ship to a consumer. This is a functional difference in treatment between in-state and out-of-state producers and purveyors of wine and beer. Therefore, the objection is overruled.

In paragraph 43, defendants and intervenor object to the Magistrate's criticism of Judge Easterbrook's focus in *Bridenbaugh* on the language of the Twenty-first Amendment as support for his conclusion that state laws limited to import controls are free of dormant Commerce Clause claims. While defendants, intervenors, and the Seventh Circuit may correctly observe that no Supreme Court case specifically holds that laws limited to the importation of liquor are problematic under the dormant Commerce Clause, the Court agrees with the Magistrate's report that it is nonetheless bound to analyze a question of facial discrimination under an established dormant Commerce Clause analysis,

which Judge Easterbrook declined to do. Therefore, there is no error in the Magistrate's refusal to accept the reasoning and decision in *Bridenbaugh* that the dormant Commerce Clause was inapplicable to importation cases. The objection in paragraph 43 is overruled.

In paragraph 44, defendants and intervenor object to the Magistrate's discrediting of the holding in *Kronheim v. District of Columbia*, 91 F.3d 193 (D.C.Cir.1996). Defendants and intervenor argue that the *Kronheim* court held that states have absolute power over liquor control. This reading by the defendants is incorrect. The *Kronheim* court held that despite a legitimate motive mixed with a protectionist motive to enforce territorial warehousing laws, under *Craig v. Boren*, 429 U.S. 190, 206, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976), once liquor entered the District of Columbia, the District had "plenary power to regulate and control ... the distribution, use, or consumption of intoxicants within her territory after they have been imported." 91 F.3d at 203. The Court agrees with the Magistrate's interpretation and application of this case. Moreover, this Court is not bound by the decision in a case outside this Circuit, even if the Court were to find it persuasive. The defendants' and intervenor's objection is overruled.

iii. **Defendants and intervenor argue that the *Heublein* decision of the Virginia Supreme Court does not support the Magistrate's Report.**

■ In objection number 45, the defendants and intervenor argue that the Magistrate's Report improperly relies on *Heublein Inc. v. ABC*, 237 Va. 192, 376 S.E.2d 77 (1989), to support a decision to strike down import controls. The defendants and intervenor are correct that the *Heublein* case did not involve import controls. Rather, it involved unconstitutional, retro-

active and extraterritorial application of another of Virginia's protectionist statutes, the Wine Franchise Act. This is entirely consistent with the Magistrate's analysis. (Report and Recommendation at 27.) The Magistrate found that the *Heublein* case provided guidance inasmuch as it exemplifies that the Virginia Supreme Court applies the dormant Commerce Clause analysis in cases where it is presented with facially discriminatory statutes. Unlike *Bridenbaugh* where the Seventh Circuit found that the Indiana Supreme Court had not decided how to reconcile its own competing statutes, here the Magistrate had guidance from the Virginia Supreme Court in *Heublein* as to how to analyze a facially discriminatory state statute. The Court agrees with the Magistrate's analysis on this point and the objection is overruled.

### c. Objections regarding federal statutes.

### i. The Wilson and Webb–Kenyon Acts

In paragraphs 46—51, the defendants and intervenor object to the Magistrate's Report because it concluded that the sole purpose of the Wilson and Webb–Kenyon Acts was to assist states which imposed a total ban on possession for personal use, and that the Webb–Kenyon Act prohibits the transportation of intoxicating liquor in violation of any law of the state in contravention of *James Clark Distilling Co. v. Western Maryland R. Co.*, 242 U.S. 311, 37 S.Ct. 180, 61 L.Ed. 326 (1917) and *West Virginia v. Adams Express Co.*, 219 F. 794 (4th Cir.1915). Based on the language, history, and application of the Wilson and Webb–Kenyon Acts, two things are clear. First, the Acts were reinstated following the repeal of prohibition to assist states in maintaining the status quo if they desired to remain dry. Second, even though no state has chosen to remain dry sixty-seven years later, their option to resort to the protections provided in these statutes remain in force. Furthermore, a state re-

tains the right under the Twenty-first Amendment to control the importation and distribution of liquor within its borders as long as it is not discriminatory. The most important aspect of these Acts are that they do no not provide defendants and intervenor with the authority they seek to invoke—the right to ignore the dormant Commerce Clause during the lawful exercise of their Twenty-first Amendment rights. Therefore, the objections made in paragraphs 46 through 51 are overruled.

### ii. The Twenty-first Amendment Enforcement Act

In paragraph 52, the defendants and intervenor contend that the Report makes no effort to synthesize its view of the Webb–Kenyon Act as a "useless relic" with the Twenty-first Amendment Enforcement Act passed by Congress in 2000. First, the Magistrate's Report does not find that the Webb–Kenyon Act was a "useless relic," even if the Report does not adopt the defendants' and intervenor's interpretation of the Act. Second, it is correct that the Court should not construe a statute to render it meaningless. However, the defendants and intervenor asserted in their motions for summary judgment that the Twenty-first Amendment Enforcement Act conclusively supported their entire position that Congress "clearly and positively spoke to the issue of alcoholic beverage commerce in the states, thereby rendering the 'dormant' or 'negative' Commerce Clause inapplicable." (Defs.' Amend. Mot. in Supp. of Summ. J. at 2); *see* Pub.L. 106–386, effective Jan. 25, 2001. Although, as mentioned above, it would be ridiculous to require every Court to set out in full the provisions of every statute upon which it relies, it is important to look at the full scope of what is provided under such a clear mandate.

A perusal of this Act demonstrates that it creates a civil cause of action to enforce

state laws in federal court by way of injunction. Sections 2(e)(1) and (2) specifically set out that the statute is to be construed as applicable to state law as the Twenty-first Amendment has been interpreted by the Supreme Court, including as it relates to other constitutional provisions. This statute cannot possibly be interpreted as the defendants and intervenor would have the Court do: that the Act "render[s] the 'dormant' or 'negative' Commerce Clause inapplicable." (Defs.' Mem. at 2). Although it is true that the legislative history of the Twenty-first Amendment Enforcement Act includes letters from many states attorneys general, including the attorney general of Virginia, professing the perceived need for the statute to prevent, among other things, direct shipments to juveniles in order to diminish underage drinking and driving, the plain language of the statute creates only a federal forum for states to seek injunctive relief to enforce their otherwise valid constitutional statutes relating to intoxicating beverages. Therefore, the objection in paragraph 52 is overruled.

### iii. The Federal Alcohol Administration Act

█ In paragraphs 53 and 54, defendants and intervenor generally object to the Report's view of the federal statutes, namely the Federal Alcohol Administration Act, and their impact on a state's powers to enforce its own laws regulating the importation, distribution, and sale of alcohol as grounds for denial or revocation of a federal permit. To the extent it is relevant, the Court does not read the Magistrate's Report to ignore this fact. As long as a state's statutes are constitutional or otherwise enforceable, violation of a state law is grounds for denial or revocation of a federal permit. Because this is true, where an out-of-state entity has violated a valid state law, the out-of-state entity is subject to having its entire national business shut down permanently—the

ultimate commercial sanction. Therefore, it is proper to accept this as a fact, but it does not support the state's argument that its prohibition on interstate direct shipment is the least discriminatory means of enforcing its legitimate laws to prevent, for instance, its diversion, drinking age, and purity laws.

While it is correct to state that the exercise of federal jurisdiction in enacting certain alcohol control statutes is an exercise of Congress' duties and powers under the Commerce Clause, it is incorrect to conclude that "[c]entral to the Report's conclusions is its mistaken view that there are no federal policies adopted pursuant to Congress' positive powers . . . to regulate interstate commerce." Nowhere in the Report is this stated or implied. In fact, the Magistrate discussed the very instances where the Congress has exercised its positive commerce clause powers and what impact such action has on the interstate trade in alcohol. No manufacturer, distributor, importer, or retailer of wine is without the jurisdiction of these federal acts. Any business or individual found in violation of a valid state law may forfeit its license—its lifeblood—under the federal statutes. The Twenty-first Amendment Enforcement Act even creates a federal civil injunctive remedy where there is a violation of a state's valid laws. There is nothing in the Magistrate's report to the contrary. Therefore, defendants' and intervenor's objections in paragraphs 53 and 54 are overruled.

### iv. "Market Participant" doctrine

█ In paragraphs 55 and 56, defendants and intervenors object that the Magistrate's Report engages in an "erroneous and tortured analysis that is not sanctioned by existing precedent" in finding that the ABC impermissibly discriminates against out-of-state wine by limiting its preference to retailing only in-state wine in its state-owned liquor stores. While the

Magistrate may have been tortured by this case, the analysis is not.

Even though it is an important case, the market-participant question does not rise and fall solely on the facts of the *Hughes v. Alexandria Scrap Corp.* case. 426 U.S. 794, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). The Magistrate specifically found that as a matter of public policy, a state has legitimate interests in protecting, promoting, and even subsidizing its citizens when the state acts as a market participant. *See Id.* at 810, 96 S.Ct. 2488; *See also Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. 564, 593–594, 117 S.Ct. 1590, 137 L.Ed.2d 852. In this case, there is no question that the state, even in the context of its control over the ABC stores, is not only a market participant but the regulator of the market in Virginia. The subsidy to the local wine market is not permissible when it excludes all others based on out-of-state status. *New Energy Co. of Ind. v. Limbach*, 486 U.S. at 277, 108 S.Ct. 1803. In this case, there is no error in the Magistrate's finding that the state's argument that its regulatory role is distinct from its market participant role cannot be sustained. Therefore, the objections in paragraphs 55 and 56 are overruled.

### 2. Plaintiffs' Objections

Plaintiffs object that the Report does not include important legislative history regarding the Twenty-first Amendment, Webb–Kenyon Act, and Wilson Act. The Court agrees that the history and context of the Twenty-first Amendment and the Acts are important and the Court sustains the plaintiffs' objection to the extent that it seeks a declaration that the Congressional Record is relevant.

Plaintiffs' next objection argues that the Report overlooks the argument that the language of the Wilson Act itself does not permit discriminatory regulation by states.

The language of the Act speaks for itself and is reproduced in full in the Report, however, the plaintiffs are correct that the Report neglects to mention that the Act provides states the authority to regulate intoxicating liquors "to the same extent and in the same manner as though such ... liquors had been produced in such State or Territory ...." Therefore, the objection is sustained on the basis of this language.

■ Plaintiffs also make the objection that the Report "needlessly" analyzes the state's discriminatory laws as weighed against the core powers endowed by the Twenty-first Amendment. Plaintiffs argue that such an analysis is necessary only when the state's police powers under the Twenty-first Amendment conflict with a federal power exercised under the positive Commerce Clause. The Court finds this argument to have some merit, as discussed above in relation to the defendants' and intervenor's objections, but the objection is overruled because the core concerns analysis provides context for determining whether there is a legitimate exercise of the state's police powers which may assist it in overcoming the discriminatory nature of its statutes. *See Bacchus*, 468 U.S. at 263, 104 S.Ct. 3049.

### C. OBJECTIONS TO THE REPORT'S ANALYSIS OF THE PROPER REMEDY

■ With the exceptions noted above in reference to the parties' objections, the Court agrees with the Magistrate's analysis of the issues in this case, and the Magistrate's conclusion that the statutes at issue are unconstitutional forms of discrimination in their in-state preferences for Virginia wine and beer. The Court's remaining task is to address the appropriate remedy for these violations.

The defendants' and intervenor's position with respect to the remedy proposed

by the Magistrate's Report is that, although they dispute the existence of an unconstitutional in-state preference, they agree with the Magistrate's proposal that only the violating sections should be severed from the Act as a whole and stricken.

The plaintiffs, on the other hand, argue that the proper remedy, and the only remedy that would vindicate the constitutional rights violated by Virginia's current statutory scheme, is a declaration that the ban on direct shipment from out-of-state sources is unconstitutional, and an injunction prohibiting the state from enforcing the direct shipment ban against citizens of the Commonwealth who would purchase wine and beer from out-of-state and have it shipped to them in Virginia, as well as against those who would sell and ship to them.

 The plaintiffs first object that the Magistrate's Report fails to apply settled remedial precedent. Where a statute is defective because of underinclusion, as in this case, federal remedial law provides two alternatives: the Court may "either declare [the statute] a nullity and order that its benefits not extend to the class that the legislature intended to benefit, or it may extend the coverage of the statute to include those who are aggrieved by the exclusion." *Welsh v. United States,* 398 U.S. 333, 361, 90 S.Ct. 1792, 26 L.Ed.2d 308 (1970) (Harlan, J., concurring). The Supreme Court has held that courts should generally apply a presumption of extension of benefits rather than nullification. *See California Fed. Sav. & Loan Ass'n v. Guerra,* 479 U.S. 272, 291–92, 107 S.Ct. 683, 93 L.Ed.2d 613 (1987); *Nguyen v. I.N.S.,* 533 U.S. 53, 95–96, 121 S.Ct. 2053, 150 L.Ed.2d 115 (2001) (Scalia, J., with Thomas, J., concurring) ("[I]n the absence of legislative direction *not* to sever [an] infirm provision, 'extension, rather than nullification' of a benefit is more faithful to the legislative design.") (emphasis in origi-

nal, citations omitted). Additionally, the Fourth Circuit has followed this practice in dormant Commerce Clause cases. *See Envtl. Tech. Council v. Sierra Club,* 98 F.3d 774 (4th Cir.1996) (striking down caps on out-of-state hazardous waste rather than applying them to in-state waste). Given this precedent, the Court finds that the ban against directly shipping wine and beer from out-of-state is unconstitutional and that, perforce, all of the challenged statutes are unconstitutional. The plaintiffs' objection in this regard is sustained.

 As discussed in the Magistrate's Report, the issue then becomes whether the offending statutes are severable from the rest of the Act. The plaintiffs second objection is that the offending statutes are not severable in the way the Magistrate's Report suggests. The question of severability is controlled by state law. *Leavitt v. Jane L.,* 518 U.S. 137, 139, 116 S.Ct. 2068, 135 L.Ed.2d 443 (1996). Under Virginia law, to determine whether the offending portions of the statute can be severed, this Court must determine whether the General Assembly would have passed the Act without the preference for in-state wine and beer. *See Heublein, Inc. v. Dept. of Alcoholic Beverage Control,* 237 Va. 192, 200, 376 S.E.2d 77 (1989). If not, the entire statutory scheme must fail.

The Court agrees with the plaintiffs and respectfully disagrees with the Magistrate's conclusion that the provisions at issue in this case are severable. First, the Virginia ABC Act contains no severability clause indicating legislative intent for a portion of the Act to survive if the rest is declared invalid. Second, there are no special circumstances at issue in this case that rebut the presumption in favor of extension of a remedy over nullification, and there is no indication of contrary legislative intent. Finally, this Court is guided by the Virginia Supreme Court's analysis in *Heublein.*

The *Heublein* case addresses how much of Virginia's ABC Act is affected by a statute being declared unconstitutional. Essentially, *Heublein* instructs that the Court has three options: 1) to declare only the three core statutes criminalizing out-of-state direct marketing unconstitutional and enjoin their enforcement; or 2) to declare each of the challenged statutes unconstitutional and enjoin their enforcement; or 3) to declare each of the separate Titles of the ABC Act in which the unconstitutional sections are located (in this case, all of the Titles) to be unconstitutional. The Court agrees with the plaintiffs that the second option is the most preferable in this case. Declaring unconstitutional and enjoining the enforcement of each of the challenged statutes effects the intent of the legislature, serves the interests of the consumer and the dormant Commerce Clause, and preserves the police powers of the Commonwealth to further its legitimate interests under the ABC regime. For these reasons, therefore, plaintiffs' objection to the remedy is sustained.

Finally, plaintiffs object to the Magistrate's analysis of the parameters of the "in-state interests" that the ban on direct shipment was designed to serve. Plaintiffs argue that the wholesalers and importers comprise the "real" state interest, rather that the "quaint fiction" that the state interest is the promotion of temperance and enforcement of the ABC regulations. Plaintiffs assert that such a determination is a defining element of the extent of the discrimination as well as the appropriate remedy for it. Plaintiffs argue that the fact that all wine, beer, and liquor produced out-of-state must pass through a Virginia importer and wholesaler before it can reach a consumer makes the market for these products subject to the "whims" of the wholesaler. In other words, the plaintiffs seek to introduce the argument that the legislature is in cahoots with the wealthy special interest groups in order to preserve the wholesaler/importer monopoly in Virginia. The Court rejects this argument. While there may be a supportable argument that protecting in-state wholesalers and importers is the true and illegitimate interest behind the statutes at issue in this case, it is truly unnecessary for the Court to entertain this argument in order to resolve the dormant Commerce Clause question. The plaintiffs' objection is therefore overruled.

## IV. CONCLUSION

Upon review of the record, the Magistrate Judge's findings, and the objections, the Report and Recommendation will be accepted and adopted with the modifications made by the sustained objections, as stated above.

An appropriate Order shall issue.

### FINAL ORDER

In accordance with the accompanying Memorandum Opinion, it is hereby ORDERED that:

1. The Report and Recommendation is ACCEPTED and ADOPTED WITH MODIFICATIONS, as stated in the accompanying Memorandum Opinion.

2. The objections filed by the Plaintiffs are OVERRULED IN PART and SUSTAINED IN PART, as stated in the accompanying Memorandum Opinion.

3. The objections filed by the defendants and intervenor are OVERRULED IN PART and SUSTAINED IN PART, as stated in the accompanying Memorandum Opinion.

4. Plaintiffs' motion for summary judgment is GRANTED, and the Clerk is DIRECTED to enter judgment in favor of the Plaintiffs.

5. Defendants' and Intervenor's respective motions for summary judgment are DENIED.

6. The Court specifically FINDS that the following sections of the Code of Virginia are unconstitutional, as stated in the Memorandum Opinion: 4.1–103(1); 4.1–119(A); 4.1–207(2), (4), (5); 4.1–208(3), (6), (7), (8); 4.1–209(2), (5); 4.1–302; 4.1–303; 4.1–310(B), (C).

7. The Defendants are ENJOINED from enforcing the provisions of the unconstitutional statutes.

8. The Court RESERVES RULING on whether the Defendants violated the provisions of 42 U.S.C. § 1983 and the Plaintiffs' request for attorneys' fees until the parties have given the Court further guidance on such issues in light of recent Fourth Circuit cases.

9. The Clerk is DIRECTED to treat the Plaintiffs as the prevailing party for assessment of other costs associated with the litigation.

Let the Clerk send a copy of the Memorandum Opinion and Final Order to all counsel of record and to Magistrate Judge Dohnal.

It is so ORDERED.

1. Plaintiffs seek related relief in the form of a declaratory judgment. There are also several pending motions that are addressed herein and which are the subject of a separate order.

2. There are additional, related arguments as identified and discussed herein, but the primary challenge concerns what is referred to for simplicity sake as the "direct shipment" issue. See discussion at 430–31, *infra*.

3. The practical effect of the "Virginia preference" is that as many as two steps (wholesale and retail) are eliminated in the otherwise required three-step (tier) regulatory process that requires all alcoholic beverages originat-

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

DOHNAL, United States Magistrate Judge.

This matter was referred to the undersigned by the District Court pursuant to 28 U.S.C. §§ 636(b)(1)(A), (C) and Fed. R.Civ.P. 72 for resolution of various non-dispositive issues and a report and recommendation on cross-motions for summary judgment.[1] It is recommended for the reasons stated that the following be adopted as the opinion of the Court.

Plaintiffs have properly pled causes of action which invoke the Court's federal question jurisdiction under the United States Constitution and relevant statutes, 42 U.S.C. §§ 1983,1988; 28 U.S.C. §§ 2201, 2202. The case, reduced to its essence,[2] is a constitutional challenge to the Virginia regulatory scheme which prohibits the shipment from outside Virginia of any beer, wine or distilled spirits directly to a consumer inside Virginia (direct shipment) without it passing through a Virginia licensed wholesaler or retailer while at the same time it allows shipment of beer and wine from Virginia producers within the state directly to consumers inside and outside of Virginia.[3]

ing from out of Virginia to pass from producer to wholesaler (first tier), from wholesaler to retailer (second tier), and then from retailer to legally authorized consumer (third tier). The significance of the multi-tiered system is, according to the Defendants; that it allows for maximum degree of control and oversight to inspect (prevent adulteration), track (prevent diversion and promote temperance), tax, and enforce (prevent illegal production and consumption) pursuant to the comprehensive regulatory scheme in effect that deals with the manufacture, importation, distribution, and sale of alcoholic beverage products. Coleburn Aff. ¶¶ 118–19.

Plaintiffs Clint Bolick and Robin Heatwole are individual consumers of wine, beer, and distilled spirits while the Plaintiffs Dry Comal Creek Winery, Miura Vineyards, and Hood River Vineyard are all out-of-state growers and producers of wine. (Pls.' Am. Notice and Mot. for Summ. J., or in the Alt. for Decl. J. at 8)(Pls.' Mot. Summ. J:). The issue of standing for the named Plaintiffs to maintain the action has been resolved by earlier order of the district court which also defined the scope of the Plaintiffs' claims to encompass the sate regulatory scheme affecting the shipment and sale of all alcoholic beverages, namely, beer, wine, and distilled spirits. (Order.Feb. 7, 2000). The Defendants—Clarence W. Roberts, Sandra Canada, and Clater Mottinger— are all appointed members of the Virginia Alcoholic Beverage Control Board (ABC Board or Board) who are sued in their official capacities as proper party defendants. Va.Code Ann. §§ 4.1–102–103 (1950 & Supp.2000); *Monell v. Dep't of Soc. Serv.*, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

### Procedural History

This is a complex case because of the constitutional issues involved and the necessity in the interest of judicial economy and efficiency, to allow the parties a full opportunity to explore all possible evidentiary considerations before a final determination was made of relevancy and materiality. To preclude piecemeal litigation, the scope of the case was expanded to encompass a challenge to the state regulatory scheme involving the shipment and distribution of all alcoholic beverages as opposed to the initial focus by the Plaintiffs solely on wine. As a consequence, amended pleadings were permitted with an extended discovery period and several hearings were held. Numerous discovery disputes were resolved by the court during multiple depositions which were conducted in the Court's conference facilities to further expedite the process. In addition several motions in limine and related evidentiary objections have been submitted in addition to the pending motions for summary judgment. A final hearing on all motions was held on January 19, 2001, and the transcript of the proceeding was docketed on March 16, 2001. The Court closed the record at the conclusion of the final hearing and took all matters under advisement. Leave was granted for various interested parties to submit briefs *amicus curiae*.[4] The Court also awaited a decision by the Supreme Court as to whether it would grant *certiorari* in a recent case primarily relied on by the Defendants and Intervenor.[5] Because the Supreme Court denied certiorari in the case for, as usual, unstated reasons, and all

---

**4.** Wine and Spirits Wholesalers of America, Inc. and The Coalition For Free Trade.

**5.** *Bridenbaugh v. Freeman–Wilson,* 227 F.3d 848 (7 th Cir.2000), cert. *denied sub nom. Bridenbaugh v. Carter,* 532 U.S. 1002, 121 S.Ct. 1672, 149 L.Ed.2d 652 (2001). The initial decision in another case involving relevant issues is not final, pending a motion for reconsideration. *Dickerson v. Bailey,* 87 F.Supp.2d 691 (S.D.Tex.2000). Additional actions in what appears to be a coordinated national effort to challenge similar regulatory schemes in other states are pending in several federal courts, but the litigants here are enti-

tled to a resolution within a reasonable time and the vagaries among different state regulatory **schemes** are such that there would undoubtedly be distinguishing features among the several actions in any event. *See Bainbridge v. Bush,* 148 F.Supp.2d 1306, 1312–15 (M.D.Fla.2001) (although the statutory scheme in *Bainbridge* appears comparable to Virginia's, the Court respectfully disagrees with the court's interpretation and application of key precedent, including *North Dakota v. United States* 495 U.S. 423, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990), *Kronheim v. District of Columbia,* 91 F.3d 193 (D.C.Cir., 1996) and the *Bridenbaugh* decision.)

issues have been thoroughly explored by brief and in oral argument, the matter is ready for disposition.

### Standard of Review

The standard of review for resolving a motion for summary judgment is well-known. Summary judgment is to be granted only if there is no genuine issue as to any material fact when the evidence and all justifiable inferences are viewed in the light most favorable to the non-moving party and the moving party is entitled to relief as a matter of law. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 251, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The court must undertake a "dual inquiry into the genuineness and materiality of any purported factual issues." *Ross v. Communications Satellite Corp.,* 759 F.2d 355, 364 (4th Cir.1985). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not publicly suffice." *Id.* "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, disposition by summary judgment is appropriate." *Teamsters Joint Council No. 83 v. Centra, Inc.,* 947 F.2d 115, 119 (4th Cir. 1991). It is not the court's role to weigh the evidence, but instead to decide whether there exists a genuine issue for trial. *Anderson v. Liberty, Inc.,* 477 U.S. at 249. In addition, where there is federal jurisdiction, declaratory judgment relief pursuant to *Fed.R.Civ.P. 57* and 28 U.S.C. § 2201 is appropriate to resolve the legal rights of the parties if there is no dispute as to material facts. *See Columbia Gas Transmiss'n Corp. v. Drain,* 237 F.3d 366, 370 (4th Cir.2001).

The parties have filed motions for summary judgment from which the Court has determined that no genuine issue of material fact exists in regard to essential issues. This case is essentially a facial challenge to a state statutory and related regulatory scheme. While the discovery in this matter has been voluminous, taking over a year to develop, and certain facts are necessary to place the matter in proper context, the basic issue of whether the challenged statutory and regulatory scheme may stand is a question of constitutional law.

### Material Facts Not in Dispute

The Court finds that the following constitute material facts that are not in dispute: [6]

1. Congress enacted the Federal Alcohol Administration Act to regulate interstate and foreign commerce in distilled spirits, wine and malt beverages and to enforce the Twenty-first Amendment. Federal law requires that all importers, sellers, distillers, rectifiers, producers, bottlers, warehousers, and purchasers for resale of beer, wine and distilled spirits hold a basic permit issued by the Secretary of the Treasury. 27 U.S.C. §§ 203–204.

2. State liquor control of wine, beer and distilled spirits (alcoholic beverages) in Virginia is authorized by the ABC Act and by regulations promulgated by the ABC Board (Board). Va.Code Ann. §§ 4.1–100—516; and 1934 Va Acts Ch. 94. The Board was created to be the agency with "the exclusive power to issue all state licenses for the manufacture, sale and distribution of alcoholic beverages in this State, and should be

---

**6.** Accordingly, the resolution of all pending motions constituting an objection to the consideration of certain evidence or asserting admissibility on some stated basis such as judicial notice is set forth in a separate order accompanying this report and recommendation, the Court concluding that the basic claim consists of a facial challenge to a statutory scheme for which a detailed factual predicate is neither necessary nor appropriate.

given broad authority to refuse, grant or revoke such licenses." (Liquor Control (Jan.1934), Sen. Doc. 5 at 8).

3. Virginia instituted what is commonly known as a three-tier system of alcohol distribution in response to the national repeal of Prohibition. The Board requires that only state licensees may import beer or wine into Virginia from out-of sty sources, including producers (first tier). Most wine and beer is imported into the state by wholesalers and then sold to retail licensees (second tier). Retail licensees may only sell alcoholic beverages to individuals entitled to purchase alcohol for consumption (third tier).

4. Wholesalers must conduct their businesses under Board regulation and operate from approved locations with approved warehouses. They must keep accurate account of the disposition of such wine and beer and show on their records whether and to whom wine and beer was transferred. Wine purchase orders, for example, must include specific language prescribed by law and when a wholesaler orders wine, it must notify the Board so that ABC agents can track incoming shipments and collect a tax.

5. Distilled spirits are primarily imported into Virginia because there are few distillery operations in the state and such products are received exclusively by the Board before shipment to state-owned and operated ABC stores for retail sale.

6. The ABC system, with a few minor exceptions, is the entity in Virginia authorized to acquire, store, distribute and sell distilled spirits in Virginia. The Board operates its own off-premises liquor stores for sales to the general public and also distributes to on-premises licensees such as bars and restaurants which sell spirits by the drink. VaCode Ann. § 4.1–310.

7. Virginia requires Virginia wineries and farm wineries to be licensed. Retail off premises winery and beer licensees, including retail stores, are authorized to ship their products directly to purchasers both inside and outside of Virginia in accordance with Board regulations. Va. Code Ann. §§ 4.1–209(A)(2), (5).

8. Virginia wine producers may therefore ship directly to Virginia consumers, without having to first ship the product to a wholesaler or other licensee, but all out-of-state wine sources must ship their product to a licensed wholesaler or other licensee.

9. Virginia law requires that ABC stores only market and sell Virginia-produced wine. Va.Code Ann., § 4–1–119(A).

10. Virginia ABC stores do not market any beer, including Virginia-produced beer.

11. Alcoholic beverages originating from out-of-state may not be distributed in Virginia unless they have been consigned to a wholesaler or a retailer licensed by the Board.

12. No out-of-state producer may be a licensed Virginia wholesaler or retailer. Va.Code Ann. §§ 4,1–206–211; 223; 310.

13. Virginia licensees are subject to jurisdiction and enforcement by the Board as well as the Bureau of Alcohol, Tobacco and Firearms of the United States Treasury Department.

14. Both Virginia and federal, law require strict adhesion to enforcement provisions which were designed to promote temperance and prevent vertical integration. *See generally 27 U.S.C. 205–208;* Coleburn Aff ¶ 116.[7]

---

**7.** Unless otherwise noted, affidavits, reports and transcript citations can be found attached to Defendants' and Intervenor's Joint Appendix filed with their respective Motions for Summary Judgment.

15. It is a misdemeanor criminal offense for any entity to ship alcoholic beverages into Virginia without a Virginia license. It is also a misdemeanor criminal offense for any Virginia consumer to receive out-of state direct shipments of alcoholic products. Va.Code Ann. § 4.1–310.

16. ABC stores sell approximately 2000 different alcoholic products including distilled spirits manufactured in Virginia and elsewhere; Virginia-produced wine; vermouth manufactured outside of Virginia and both in-state and out-of-state manufactured mixers. Coleburn Aff. ¶ 5. ABC stores sell alcohol by the bottle or by the case. Va.Code Ann. §§ 4.1–103, 119, 122; and Adam's Aff. ¶ 5.

17. If the ABC store does not have a particular product in stock, consumers currently may special order any of approximately 315 limited demand items in the ABC special order catalog which are available by the bottle or case. These products are stored at a central ABC warehouse in Richmond. Virginia and are available at any ABC store throughout the state within approximately five days.

18. The ABC system will seek to fulfill consumer requests for products that are neither sold in ABC stores nor held in storage by the ABC at its warehouse, as long as it can be "legally imported into and purchased anywhere within the Continental United States" and the consumer is willing to buy at least an entire (or multiple) case(s). Adam's Aff.¶ 6 (See Defs.' Am, Mem. at 16).

19. The Board not only controls the importation and delivery of alcohol into the Commonwealth through its licensing, distribution and retail/wholesale functions, it also functions as the law enforcement agency responsible for inspection, investigation and enforcement of the Virginia ABC Act.

20. Virginia ABC law enforcement jurisdiction is confined to Virginia.

21. Title 27 of the U.S.Code grants enforcement jurisdiction to the Secretary of the Treasury who oversees delegated law enforcement responsibilities to the Bureau of Alcohol, Tobacco and Firearms. *See generally* 27 C.F.R. part 1.

22. Distilled spirits typically available in Virginia have an alcoholic content by volume of 30% to 60%. Coleburn Aff ¶ 11.

23. Beer typically available in Virginia has an alcoholic content by volume of 3% to 5%. Coleburn Aff. ¶ 12.

24. Wine typically available in Virginia has an alcoholic content by volume of 5% to 12%. Coleburn Aff.¶ 13.

25. State law requires that an individual be at least twenty-one years of age to legally purchase or consume alcoholic beverages of any kind. Va.Code Ann. §§ 4.1–304(i), 305.

26. Congress enacted a national *minimum* drinking age law by which it authorized the Secretary of Transportation to with hold federal funds from states that did not enact legislation establishing the drinking age at twenty-one by September 30, 1985, 23 U.S.C. § 158.

27. Taxation through liquor regulation was originally intended for social control, not to raise revenue. (Sen. Doc. 5 at 2). The ABC system is self-sustaining and obtains revenue from the collection of excise taxes on wine and beer sold at wholesale and liquor sold at retail; profits from sales of distilled spirits, wins, mixers and lottery tickets; license fees; fins and other penalties assessed for ABC law violations, Coleburn Aff. ¶¶ 6–9. The funds either support ABC operations or are transferred to the state's General Fund to be used for a variety of unrelated pur-

poses, including educational objectives. *Id.*

While the ABC system is not funded by appropriation, it receives approximately $1.2 million in grant money from organizations such as the Office of Juvenile Justice and Delinquency Prevention (OJJDP), the National Highway Transportation Safety Administration, and the Century Council (a private foundation funded by distilleries). (Defs.' Am. Mem, at 31; ¶¶ 81). The Board reports that it uses such funds to promote temperance and fund campus and community prevention efforts.

### Overview

This case presents the Court with the issue of whether certain of Virginia's regulatory statutes and;implementing regulations concerning the distribution of beer, wine, and distilled spirits are violative of the "dormant" Commerce Clause and, if so, are they nevertheless sanctioned by the Twenty-first Amendment or other controlling authority. The Defendants and Intervenor argue that the central issue does not concern a dormant Commerce Clause question, but simply whether the challenged statutory scheme is authorized by the Twenty-first Amendment and/or other pertinent federal statutes. (Defs.' Mem. in Opp'n to Pls.' Mot. for Summ J. and in Supp. of Defs.' Mot. for Summ. J. at 4–6, 35–37.) The Supreme Court of the United States, the court of appeals for this circuit, and the courts of record of the Commonwealth of Virginia have provided a substantial body of case law by which this court is guided.

### Method of Analysis

Article 1, section 8, clause 3 of the United States Constitution, the Commerce Clause, grants to Congress the sole authority to regulate commerce among the several states. The Commerce Clause is the primary source of federal regulatory power over matters concerning interstate commerce. See *New York v. United States*, 505 U.S. 144, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992) (discussing the historical and analytical approach to defining the scope of federal and state authority under the Constitution). Generally, where Congress can articulate a nexus to interstate commerce, it may impose constitutional regulation on almost any activity having potential multi-state impact.[8] The Commerce Clause has also been interpreted to have a "negative" or "dormant" effect with respect to a state's capacity to regulate commerce with other states, See *New York v. United States*, 505 U.S. at 156–157, 112 S.Ct. 2408 (describing the interrelation of the Commerce Clause, the Tenth Amendment, the Guarantee Clause, the Spending Clause and the Supremacy Clause); *Gibbons v. Ogden*, 9 Wheat. 1, 231–232, 239, 6 L.Ed. 23 (1824)(Johnson, J. concurring) (agreeing that the Commerce Clause is more than a grant of power to Congress to regulate interstate commerce and includes a negative effect that prohibits states from

---

**8.** The Commerce Clause powers are not without bounds. *United States v. Lopez,* 514 U.S. 549, 557, 568, 115 S.Ct. 1624, 131 L.Ed.2d 626 (1995) (limiting federal power to regulate traditionally state-regulated firearms possession). However, the Commerce Clause is the source of authority to regulate a wide range of national concerns from comprehensive civil rights legislation, *Heart of Atlanta Motel, Inc. v. United States,* 379 U.S. 241, 256, 85 S.Ct. 348, 13 L.Ed.2d 258 (1964), to the disposal of low-level radioactive waste, *New York v. United States,* 505 U.S. 144, 156–157, 112 S.Ct. 2408, 120 L.Ed.2d 120 (1992). But see *United States v. Morrison,* 529 U.S. 598, 120 S.Ct. 1740, 1754, 146 L.Ed.2d 658 (2000) (discussing the general areas where Congress may regulate in interstate commerce, but holding the Commerce Clause did not vest Congress with the power to enact a federal private right of action to victims of gender-motivated violence in the Violence Against Women Act).

interfering in interstate commerce); *see also South Carolina State Highway Dept. v. Barnwell Bros., Inc.*, 303 U.S. 177, 185, 58 S.Ct. 510, 82 L.Ed. 734 (1938) (holding that the Commerce Clause "by its own force" precludes state interference with interstate commerce).[9]

The dormant Commerce Clause prevents a state from implementing isolationist trade policies and practices between it and other states. *Wyoming v. Oklahoma*, 502 U.S. 437, 469–70, 112 S.Ct. 789, 117 L.Ed.2d 1 (1992). Dormant Commerce Clause doctrine protects the national free market from protectionist state legislation unless Congress has acted specifically to establish a national policy or has authorized states to engage in otherwise *discriminatory* trade practices. *Envtl. Tech. Council v. Sierra Club*, 98 F.3d 774, 782 (4th Cir.1996) (citing *Oregon Waste Sys., Inc. v. Dept. of Envtl. Quality*, 511 U.S. 93, 114 S.Ct. 1345, 128 L.Ed.2d 13 (1994)), That the dormant Commerce Clause is the firm law in this circuit was reconfirmed in a recent decision of the Fourth Circuit. *Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 333 (4th Cir.2001) (recognizing it is well-settled that the Commerce Clause "denies the States the power unjustifiably to discriminate against or burden the interstate flow of articles of *commerce*") (citation omitted).

The Defendants and Intervenor do not question the existence of the dormant Commerce Clause; rather, they assert it has no application to this case in light of what they argue is clear Congressional authority that controls all relevant issues involving commerce in alcoholic beverages. There can be no dispute that it has long been the law, even prior to the enactment of the Eighteenth amendment, that beer, wine, and distilled spirits are articles of interstate commerce. *Louisville & Nashville R.R. Co. v. F.W. Cook Brewing Co.*, 223 U.S. 70, 82, 32 S.Ct. 189, 56 L.Ed. 355 (1912); *see* also the Federal Alcohol Administration Act, 27 U.S.C. §§ 201–205 (referring generally to intoxicating liquor with respect to its interstate commerce nature.)[10] Given such ample authority, there is no doubt but that the dormant Commerce Clause exists and that it mint be the basis for analysis in this case unless it is outweighed by the Twenty-first Amendment or other superceding authority. The Court must therefore initially determine whether the dormant Commerce Clause has been explicitly rendered inapplicable by express authorization of Congress in an abdication of its power to

---

9. The Supreme Court's interpretation of state taxation as a burden under the dormant Commerce Clause like all constitutional law, has evolved over time. For instance, early on the Court steadfastly held that states had no right to tax interstate commerce in "any form." *Quill Corp. v. North Dakota*, 504 U.S. 298, 309, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (citations omitted)(discussing the historical interpretation of a state's power to tax interstate commerce and what form a tax may take). Later, the Court developed a distinction between direct and indirect burdens, generally proscribing the former but permitting the latter, *Id.* The Court observed that the current view is " 'with certain restrictions, interstate commerce may be required to pay its fair share of state taxes.' " *Id.* at 310, n. 5 (citing *DIL Holmes Co. v. McNamara*, 486

U.S., 24, 31, 108 S.Ct. 1619, 100 L.Ed.2d 21 (1988)).

10. As explained more fully, *infra*, Defendants argue the court may not apply the dormant Commerce Clause analysis and its strict scrutiny standard. (Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. and in Supp. of Defs.' Mot. for Summ. J. at 10, note 9, (Doc. 140) citing *Maine v. Taylor* 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986), *North Dakota v. United States*, 495 U.S. 423, 424, 110 S.Ct. 1986, 109 L.Ed.2d 420 (1990)). However, these cases do not support Defendants' proposition and the Court finds that the sole appellate court decision in *Bridenbaugh v. Freeman–Wilson*, 227 F.3d 848, that does support the argument is distinguishable. *See* discussion, *infra* at 433–41.

regulate commerce in alcohol so as to specifically authorize the states to erect absolute barriers to other states to trade in alcohol. *Envtl. Tech. Council v. Sierra Club*, 98 F.3d at 782. If so, then the analysis ends and the Defendants prevail. *Northeast Bancorp, Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 472 U.S. at 159. If, however, Congress has not made such an explicit grant, then the analysis as mandated by the Supreme Court and the Fourth Circuit requires further inquiry into whether the subject statutes and related regulatory scheme may nevertheless survive despite the dormant Commerce Clause's apparent bar to such state action. *Brown–Forman Distillers Corp. v. New York State Liquor Auth.* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552.

The Court must apply strict scrutiny in evaluating dormant Commerce Clause claims. *City of Philadelphia v. New Jersey*, 437 U.S. 617, 624–627, 98 S.Ct. 2531, 57 L.Ed.2d 475 (1918) (holing that state regulations that facially discriminate are virtually per se invalid); accord *Bacchus Imports, Ltd. v. Dias*, 468 U.S. 263, 271, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984). The Supreme Court "has adopted a two-tiered approach in analyzing state economic regulation ... 'When a state statute directly regulates or discriminates against interstate commerce, or when its effect is to favor in-state economic interests over out-of-state interest; we have generally struck down the statute without further inquiry.'" *Healy v. Beer Inst.*, 491 U.S. 324, 337, n. 14, 109 S.Ct. 2491, 105 L.Ed.2d 275, (1989) (quoting *Brown–Forman Distillers Corp. v. New York State Liquor Auth.*, 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) and striking down price affirmation statutes). The Fourth Circuit has also confirmed its adoption of the "two tier approach in determining the constitutionality of a statutory provision challenged under the dormant Commerce Clause":

The first tier, a virtually per *se* rule of invalidity applies where a state law discriminates facially, in its practical effect, or in its purpose. In order for a law to survive such scrutiny, the state must prove that the discriminatory law is demonstrably justified by a valid factor unrelated to economic protectionism, and that there are no nondiscriminatory alternatives adequate to preserve the local interests at stake....

*Waste Mgmt. Holdings, Inc. v. Gilmore*, 252 F.3d 316, 333 (citing authority).

Supreme Court precedent directs further analysis focused on whether the challenged statutory scheme, if deemed constitutional, were "enacted throughout the country, would [it] create just the kind of competing and interlocking local economic regulation that the Commerce Claw was meant to preclude." *Healy v. Beer Inst.*, 491 U.S. at 337, 109 S.Ct. 2491. The challenged statutory scheme in this case facially discriminates against interstate commerce by prohibiting direct shipments of alcoholic beverages from out-of-state sources to Virginia consumers while permitting direct shipment by and from in-state producers and by mandating that only Virginia-produced wines be sold in its state-owned and operated stores. As such, the relevant statutes and implementing regulations constitute *per se* invalid restrictions on commerce.

If the Virginia statutes are *per se* invalid because they impose barriers to free trade among the states, the burden shifts to Defendants and Intervenor to establish that they nevertheless address a legitimate state interest so as to support the conclusion that the discriminatory law "is demonstrably justified by a valid factor unrelated to economic protectionism," *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 274, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988), *and* that there are no other nondiscriminatory means of addressing the prob-

lem. *Healy v. Beer Inst.*, 491 U.S. at 340–341, 109 S.Ct. 2491 (holding there was no neutral justification for the statute which applied solely to interstate brewers and beer shippers while allowing intrastate breweries to freely set prices); *Hunt v. Washington State Apple Advertising Comm'n*, 432 U.S. 333, 353, 97 S.Ct. 2434, 53 L.Ed.2d 383 (1977) (there must be no other means of addressing the state's interest). If, however, a statutory scheme is neutral on its face or only indirectly affects interstate commerce, the Court must apply a balancing test and find the law to be valid unless the burden on commerce is "clearly excessive in relation to the putative local benefits." *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970). This case requires the Court to engage in both analyses because some of the Virginia ABC laws in question are facially-discriminatory while others appear neutral.[11]

### Historical Perspective

Virginia's approach to regulating liquor following the repeal of Prohibition is embodied in Senate Document 5, reported on December 13, 1933, and submitted to the General Assembly of Virginia in January, 1934. A legislative committee was designated to consider whether to recommend continuation of the state as a "dry state" or to develop a comprehensive liquor control plan. The committee deemed the repeal of federal prohibition as having "Wipe[d] the state clean for a new experiment in liquor control" with "no vested or proprietary interest to be considered." (Sen. Doc. 5 at 2).

A majority of the committee agreed upon "General Principles" on which the plan was to be based which included: (1) promoting temperance, social betterment and respect for law, with taxation only as a means for social control and not as a primary source of state or local revenues; (2) the need to garner the respect and support of a large majority, of the citizens while having broad discretionary power to modify details as conditions demand; (3) providing for local option as a cardinal principle whereby voters in each community would be able to restrict the sale of liquor (with the exception of 3.2% beverages);[12] (4) causing alcoholic beverage sales be "brought out in the open and placed upon a decent plane" and eliminating the bootlegger by making the sale of alcoholic beverages available "at such prices and under such conditions as will make it economically unprofitable and difficult for the bootlegger to compete with the lawful dispenser"; (5) minimizing private profit and discouraging sales and consumption by preventing integration among manufacturers from holding interest in retailers; (6) preventing the "return of the saloon"; (7) prompting temperance by discouraging the consumption of hard liquor by making it harder to obtain while encouraging the consumption "of light fermented beverages, such as beers and wines" by making them easier to obtain; (8) and otherwise providing for the "greatest good to the

---

11. Because the statutory scheme involving wine and beer is facially-discriminatory, the more flexible balancing test is unavailable in analyzing attendant issues. *Bacchus Imports, Ltd. v. Dias*, 468 U.S. at 271. However, the Virginia state-controlled monopoly on distilled spirits (hard liquor) without any preference for in-state direct shipments does not appear *discriminatory* on its face and therefore it does not involve the more stringent test. *See* discussion, *infra*.

12. The committee deemed beer and wine with 3.2% alcohol by volume as "nonintoxicating" and thus subject neither to state liquor regulation nor local prohibition. (Sen. Doc. 5 at 1). Over time, the definitions of beer and wine came to include 3.2% beverages, namely, that which contains "one-half of one percent or more of alcohol by volume." Va.Code Ann. § 4.1–100.

greatest number of citizens as a whole." (Sen. Doc. 5 at 2–3).

The committee believed, and based its findings on the belief, that temperance would be achieved primarily through limiting access to the acquisition of hard liquors by selling only through state-run stores, by discouraging the consumption of hard liquor, and by promoting beer and wine consumption. In fact, the committee went so far as to disapprove allowing hotels and restaurants to serve hard liquor by the drink, analogizing such a practice to a saloon without "the bar and the swinging doors." (Sen. Doc. 5 at 4). Although it recognized the experimental nature of setting up a state-run liquor monopoly, the committee reasoned that the state control plan would promote temperance by, among other things, eliminating the private profit motive of private licensees, *Id.* at 5. Further, the committee opined that by establishing experimental state run liquor stores, "should a change prove necessary," a private license plan could be still substituted. *Id.* at 6. At the time, the committee wanted minimal penalties for infractions by licensees because the threat of license forfeiture was deemed sufficient, and it therefore also recommended that local police should be "intrusted" with enforcement and that "[o]nly a limited force of inspectors need be employed." *Id.* at 9.[13]

The basic question that drove the creation of Senate Document 5 and its plan for liquor control, which was ultimately adopted by the General Assembly, was whether and how to repeal the state prohibition and whether and how to institute state regulation over liquor control in order to allow localities to decide by referendum whether to remain dry. The legislature clearly made a fundamental decision to legalize the manufacture, distribution, sale and consumption of alcoholic beverages. In the process, the Committee made another fundamental determination to transform commerce in liquor from dealing with contraband to dealing with a legal product, to promote temperance by encouraging the consumption of wine and beer as opposed to hard liquor, and at the same time to pro side a safe delivery mechanism for hard liquor. Despite some differences, the Committee was clear and uniform in its resolve to minimize the importance of collecting and disbursing taxes as indicated by its de-emphasis of sanctions as well as its criticism of private financial interests in the liquor trade, all of which would enhance tax efforts and revenues. The report barely dealt with wine and beer, and excluded 3.2% beverages entirely.

### Plaintiffs' Contentions

Plaintiffs advance several related arguments challenging the Virginia statutory scheme related to alcoholic beverages based on the dormant Commerce Clause. First, Plaintiffs challenge Virginia's ban on the direct shipment of wine and beer to Virginia consumers from out-of-state entities while Virginia not only permits, but encourages, direct shipment to consumers by in-state wineries, farm wineries and to a lesser extent, Virginia breweries. (Pls.' First Am. Compl. ¶ 58(a), (c)).[14] Second, the complaint alleges that the Virginia

---

**13.** The committee report also contained two concurring statements dealing with revenue disbursement and tax allocation. *Id.* at 10–11. The minority portion of the report is interesting because it opposed putting the state "squarely in the liquor business" which "has a corruptive influence." *Id.* at 12. The minority opined that "[i]f the state goes into the [liquor] business, judging by the past, its tendencies will be to corrupt the State itself," the constitutionality of which it questioned under the Commerce Clause of the United States Constitution. *Id.*

**14.** Va.Code Ann. §§ 4.1–207(4) & (5) grant to winery and farm winery off-premises licen-

statutes unconstitutionally permit the ABC Board to refuse to grant to out-of-state entities Virginia wholesale or retail licenses based solely on out-of-state status. *Id.,* and Va.Code Ann. §§ 4.1–223(1), (2).[15] Third, Plaintiffs assert that the Virginia statutory scheme impermissibly prefers in-state off-premises retailers (including such entities as hotels, grocery stores and gift shops) to the exclusion of all other out-of-state retailers by permitting direct delivery or shipment of beer and wine to consumers by state licensees while forbidding participation by out-of-state retail establishments. (Pls.' First Am. Compl. Para.57) [16] Fourth and finally, the Plaintiffs challenge the statutory mandate that the state-operated ABC stores sell only Virginia produced wines. *Id.,* Para. 58(d).

### Undisputed Factual Predicate

It is a crime to import, ship, transport or bring alcoholic beverages into Virginia except when such shipment is to a distillery or licensee or to the Board. It is likewise illegal for a person to import wine into Virginia unless consigned first through a wine licensee. It is likewise illegal to import beer except to licensees. [17] The state does permit an individual to carry small amounts of alcoholic beverages into Virginia for personal consumption and a "reasonable quantity" of alcoholic beverages if they are part of household goods of a person relocating a personal residence to Virginia.[18]

Virginia strictly controls the sale of distilled spirits through its government-owned and operated ABC stores. A consumer may not purchase hard liquor except through a state liquor store. Va.Code Ann. §§ 4.1–103, 119(A). State liquor stores are authorized to sell "alcoholic beverages (other than beer and wine not produced by Virginia farm wineries), vermouth, and mixers, in such counties, cities,

sees the authority to deliver and ship wine "in closed containers" to "purchasers in accordance with Board regulations." Va.Code Ann. § 4.1–207(2) requires out of state producers to distribute their goods through a Virginia licensed wholesaler. Virginia-licensed retailers gift shops, wineries and farm wineries may deliver or direct-ship wine and beer to Virginia residents. Va.Code Am. §§ 4.1–209(2) & (3). As part of its statutory mandate to promote Virginia agricultural products, the Virginia Department of Agriculture and Consumer Services actively promotes the Virginia wine industry. Va.Code Ann. §§ 3.1–1060—1064. Off-premises licensed Virginia breweries may sell and ship beer directly to Virginia consumers. Va.Code Ann. § 4.1–208(7). Out-of-state beer may not be shipped into Virginia other than to a Virginia licensee, but no out-of-state producer may be granted a license. Va.Code Ann. § 4.1–208(4), 209(2). There seems to be no similar governmental entity that actively promotes the Virginia beer industry as the Virginia Wine Advisory Board promotes in-state wineries.

15. The Board may refuse to grant a wholesale wine or beer license to any person without an existing place of business or plan to establish a place of business within the Commonwealth. Va.Code Ann. § 4.1–223(1). Out-of-state wineries and breweries are functionally forbidden to hold a new wholesale license under Va.Code Ann. § 4.1–223(2) because the statute prohibits any manufacturer of beer or wine to hold a wholesale license. Virginia wholesaler wine licensees are required to either maintain an importers' license or buy only from licensed importers, Va.Code Ann. § 4.1–207(2).

16. Va.Code Ann. §§ 4.1–208(3)–(8); 209; 302; 303; 310.

17. Va.Code Ann. § 4.1–310(A),(B) & (C) make it a Class 1 misdemeanor.

18. Va.Code Ann. § 4.1–310(E) sets the limit for personal importation at "an amount not to exceed one gallon or four liters" and also makes exceptions for common carriers traveling through or into the state. Va.Code Ann. § 4.1–311 sets the parameters for transporting lawfully purchased alcoholic beverages and makes it a misdemeanor to violate the section.

and towns considered advisable by the Board." Va.Code Ann. § 4.1–119(A). State liquor stores are prohibited from selling any wine other than that produced in Virginia by Virginia farm wineries. *Id.*

### Twenty-first Amendment

The Twenty-first Amendment was ratified pursuant to Article 5 of the United States Constitution. It repealed the Eighteenth Amendment which prohibited the manufacture, sale and transportation of intoxicating liquors within, the importation into, or exportation from the United States and its territories. The prohibition of the Eighteenth Amendment was in force thirteen years. Clause two of the repealing amendment on which the Defendants and Intervenor base their arguments states: "The transportation or importation into any State, Territory, or possession of the United States for delivery or use therein of intoxicating liquors, in violation of the laws thereof is hereby prohibited."

A state enjoys constitutional protection for no other article of commerce like the authority that it has under the Twenty-first Amendment to control the regulation of alcoholic beverages within its borders. The dormant Commerce Clause prohibition against discriminatory state trade statutes is rendered inapplicable when the Constitution or Congress has authorized what would otherwise be impermissible state action that interferes with the free flow of commerce with other states. *Northeast Bancorp Inc. v. Bd. of Governors of the Fed. Reserve Sys.*, 472 U.S. 159, 174, 105 S.Ct. 2545, 86 L.Ed.2d 112 (1985). However, when a state law "regulates the sale of alcoholic beverages . . . its discriminatory character eliminates the immunity afforded by the Twenty-first Amendment." *Healy v. Beer Inst.*, 491 U.S. at 344, 109 S.Ct. 2491 (Scalia, J., concurring) (citations omitted); *City of Newport v. Iacobucci*, 479 U.S. 92, 95, 107 S.Ct. 383, 93 L.Ed.2d 334 (1986) (balancing the State's interest and power to license liquor retailers with the First Amendment right to individual freedom of expression to dance nude); *South Dakota v. Dole*. 483 U.S. 203, 206, 107 S.Ct. 2793, 97 L.Ed.2d 171 (1987) (holding that even when a state exercises one of its "core powers," the Twenty-first Amendment is not implicated where Congress has acted under its spending power).

Resolving the tension between the Twenty-first Amendment and the dormant Commerce Clause has been the subject of constitutional challenge since the repeal of Prohibition.[19] However, time and again, the Supreme Court has held that "[t]he reach of the Twenty-first Amendment is not without limit."[20] The Supreme Court

---

**19.** The Twenty-first Amendment to, the United States Constitution was ratified on February 6, 1933. See also *Bridenbaugh v. Freeman–Wilson*, 227 F.3d at. 849, 853 (Easterbrook, J. for the quorum of the panel) (holding Indiana's statutory prohibition on direct shipment of wine to consumers from out-of-state producers was constitutional because it was authorized by the Twenty-first Amendment). Judge Easterbrook reasoned from a premise that the tension is resolved in favor of upholding the state statute because the Twenty-first Amendment, "which appears in the Constitution" trumps the " 'dormant commerce clause,' which does not." *Id.* at 849.

**20.** The Court has consistently viewed such cases in the interstate commerce context: "[t]his is not to say that the Twenty-first Amendment empowers a State to act with total irrationality or invidious discrimination in controlling the distribution and dispensation of liquor within its borders —[i]t most assuredly is not to say that the Twenty-first Amendment necessarily overrides in its allotted area any other relevant provision of the Constitution." *City of Newport v. Iacobucci*, 479 U.S. at 95, 107 S.Ct. 383 (quoting *California v. LaRue*, 409 U.S. 109, 120, 93 S.Ct. 390, 34 L.Ed.2d 342 (1972)(Stewart, J., concurring)). In *City of Newport*, the city council made specific findings to support its legitimate interest in curtailing the injurious effects

has upheld discriminatory laws in only a few instances [21] and it has effectively overruled earlier decisions on the issue so as to compel the rejection of any argument as urged by the Defendants and Intervenor that a facially discriminatory statutory scheme that constitutes a barrier to the free trade of alcohol products among the states is conclusively shielded by the Twenty-first Amendment or any other existing authority. *Healy v. Beer Inst.*, 491 U.S. at 342, 109 S.Ct. 2491 (overruling *Joseph E. Seagram & Sons v. Hostetter*, 384 U.S. 35, 86 S.Ct. 1254, 16 L.Ed.2d 336 (1966), to the extent that it held (1) affirmation statutes were too conjectural to show extraterritorial effect and (2) that the Twenty-first Amendment grants states "wide latitude in the field of liquor regulation ... although such state regulation might violate the Commerce Clause in some extreme instances").

Relying on the decision in *Bridenbaugh v. Freeman–Wilson*. 227 F.3d 848 (which the Supreme Court has recently declined to review), the Defendants assert that this case can only be properly reviewed under the Twenty-first Amendment and not the dormant Commerce Clause. (Defs.' Mem. in Opp'n to Pls.' Mot. Summ. J. at 4–6, 35–3 7). Defendants also argue not only are the state statutes exempt from any dormant Commerce Clause analysis, they are expressly validated under such case precedent as *North Dakota v. United States*, 495 U.S. 423, 110 S.Ct. 1986, 109 L.Ed.2d 420, and *Kronheim v. District of Colum-*

*bia*, 91 F.3d 193 (D.C.Cir.1996). For reasons discussed herein, the Defendants and Intervenor have failed to persuade the Court that the analysis urged by them is proper not only in this circuit, but under controlling Supreme Court case law.

*Bridenbaugh v. Freeman–Wilson* held that the Twenty-first Amendment "directly authorizes state control over imports, while the premise of dormant commerce clause jurisprudence is an inference that the grant of power to Congress in Art. I § 8 cl. 3 implies a limitation on state authority over the same subject." 227 F.3d at 849. While there are some parts of the analysis in *Bridenbaugh* with which this Court concurs, there are several reasons why *Bridenbaugh* is not dispositive of this case.

First, the *Bridenbaugh* court refused to apply the dormant Commerce Clause analysis whereas this Court feels compelled to do so under the guidance of both the Fourth Circuit and the Supreme Court. See generally *Bacchus Imports. Ltd. v. Dias*, 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984) and *TFWS, Inc. v. Schaefer*, 242 F.3d 198, 204 (4th Cir.2001) (explaining that because federal interests survived the passage of the Twenty-first Amendment, the state's power to regulate alcohol " 'may be subject to the federal commerce power' " through careful scrutiny ...) (citations omitted). Second, the *Bridenbaugh* court found that there was no functional discrimination resulting in

---

of "nude dancing in establishments that serve liquor." *Id.* at 96–97.

**21.** *Maine v. Taylor*, 477 U.S. 131, 106 S.Ct. 2440, 91 L.Ed.2d 110 (1986) (holding Maine's statute prohibiting the introduction of live bait fish into the state was not violative of the dormant Commerce Clause because protection of the health of its inland fisheries was a legitimate state interest which could not be addressed by nondiscriminatory means); *Clason v. Indiana*, 306 U.S. 439, 59 S.Ct. 609, 83

L.Ed. 858 (1939) (holding that the state could properly prohibit transportation of dead animals without a license because of the threat of disease); *City of Philadelphia v. New Jersey*, 437 U.S. at 626 (Rehnquist, J., dissenting) (observing that the Supreme Court has upheld certain quarantine laws because the very movement of contagions would risk transmission of "disease, pestilence, and death such as,... substances infected with the germs of yellow fever").

the creation of trade barriers, although the state of Indiana allowed local wineries to ship wine directly to Indiana consumers: Indiana insists that "*every* drop of liquor pass through its three-tiered stem and be subjected to taxation." *Id.* at 853 (emphasis in original).[22] However, Virginia's statutes specifically authorize direct shipment of beer and wine by in-state producers and off premises licensees without requiring that the shipment pass through its three tier system while, at the same time, it absolutely prohibits such shipments from out-of-state sources. Third, the *Bridenbaugh* court interpreted not only the Twenty-first Amendment, but also the Wilson and Webb–Kenyon Acts and their respective impacts on the required analysis in ways that this Court understands to be inconsistent with the law as it has been developed by the Supreme Court. Finally, the *Bridenbaugh* court focused on a very narrow analysis of the history and language of clause 2 of the Twenty-first Amendment and that of the implementing regulations in Title 27 provisions, rather than seeking a logical synthesis among the many interstate commerce, Twenty-first Amendment, and dormant Commerce Clause cases that have evolved for over a century.

The novel approach in the *Bridenbaugh* decision is that the Seventh Circuit Court of Appeals refused to apply the analysis established by the Supreme Court because, it reasoned, the passage of clause 2 of the Twenty-first Amendment meant that "no longer may the dormant commerce clause be read to protect interstate shipments of liquor from regulation." *Id.* at 853. This Court understands that every dormant Commerce Clause question must be addressed—even with respect to the Twenty-first Amendment—with a consistent analysis. Justifying its refusal to en-

gage in the dormant Commerce Clause analysis, the Seventh Circuit rejected the well-settled constitutional parameters of the dormant Commerce Clause as it has been developed ever "since Chief Justice Marshall, for the court, delivered the judgment in *Gibbons v. Ogden.*" See *Adams Express Co. v. Kentucky,* 238 U.S. 190, 196, 35 S.Ct. 824, 59 L.Ed. 1267 (1915) (citations omitted). Instead, the *Bridenbaugh* court employed a historical analysis of the Twenty-first Amendment and the related acts of Congress pertinent to the state regulation of intoxicating liquor while dismissing altogether the interstate commerce issues raised by the facts of the case. In fact, the court stated "[n]o decision of the Supreme Court holds or implies that laws limited to the importation of liquor are problematic under the dormant commerce clause." 227 F.3d at 853. "What the Court has held, however, is that the greater power to forbid imports does not imply a lesser power to allow imports on discriminatory terms." *Id.* (citing *Brown–Forman Distillers Corp. v. New York State Liquor Auth.,* 476 U.S. 573, 579, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986)). The Court agrees with this conclusion to the extent that it means that even under the Twenty-first Amendment, a state cannot discriminate against interstate goods under the dormant Commerce Clause. However, if a state chooses to exercise its "greater power" to forbid the direct importation of alcohol, it must also be consistent in dealing with domestic production, delivery and use so as not to discriminate for purely economic advantage.

The Seventh Circuit interpreted *Brown–Forman Distillers Corp. v. New. York State Liquor Auth.,* 476 U.S. 573, 106 S.Ct. 2080, 90 L.Ed.2d 552 (1986) and *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 267,

---

**22.** Indiana requires liquor to pass through a permit holder whether a retailer or wholesal-er, but does not require it to actually pass through all three tiers of its system.

104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), as applications of "an unconstitutional-conditions approach to use of the § 2 power... eliminating economic discrimination against in-state commerce of the sort caused by" the Supreme Court's 19th century cases and the original package doctrine "without authorizing discrimination against out-of-state sellers." 227 F.3d at 853. The Court again partially agrees with this conclusion inasmuch as the Supreme Court has over time set forth different tests for analyzing liquor regulation as it confronts claims of unconstitutionality; for instance, as against free speech, the Supremacy Clause, federal preemption, the Sherman Act, and many others.[23] In this case, the Court is confronted with such an "unconstitutional-conditions" question where Virginia grants to its own farm wineries, wineries and other off-premises licensees the authority to direct-ship wine and beer to consumers while out-of-state entities are forbidden by statute to independently obtain Virginia licenses or to ship the same types of beverages directly to Virginia consumers. Although Virginia does not prohibit the importation of alcoholic beverages into its three-tier system, the preference given to in-state entities by allowing direct shipment to the consumer presents a case of actual discrimination that distinguishes this case from *Bridenbaugh*.[24]

Developments in both dormant Commerce Clause and Twenty-first Amendment analyses by the Supreme Court within the relatively recent past represent the current and thereby controlling measure of the scrutiny that these cases require. *See, e.g., California Retail Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 109, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980)(noting that the Court recently began to emphasize federal concerns to a greater extent than it ever had in its previous cases); and *Bacchus Imports Ltd. v. Dias,* 468 U.S. 263, 275, 104 S.Ct. 3049, 82 L.Ed.2d 200 (quoting *Hostetter v. Idlewild Bon Voyage Liquor Corp.,* 377 U.S. 324, 331–332, 84 S.Ct. 1293, 12 L.Ed.2d 350 (1964), "[t]o draw a conclusion... that the Twenty-first Amendment has somehow operated to 'repeal' the Commerce Clause wherever regulation of intoxicating liquors is concerned would, however, be an absurd oversimplification."). Nevertheless, the *Bridenbaugh* court seemingly ignored the Supreme Court's admonition that "we have recognized the obscurity of the legislative history of § 2[and][n]o clear consensus *concerning* the meaning of the provision is apparent." *Bacchus Imports, Ltd. v. Dias,* 468 U.S. at 274–275 (citations omitted). Although any analysis of the elusive legislative history of not only clause 2 of the Twenty-first Amendment, but also the Wilson and Webb–Kenyon Acts, is necessarily less than precise, it must result in the conclusion that all were passed with one common goal and understanding, namely, that without the express authority of Congress, those states that wished to remain dry after the repeal of prohibition would be powerless to do so. While more current social, health, safety and taxation concerns relating to alcohol may have evolved and transformed over the years, the legis-

---

**23.** See, infra, note 27.

**24.** The *Bridenbaugh* court also found it decisive that its interpretation of clause 2 "closed the loophole" created by the earlier "original package" cases of 1880 and 1890 and the Supreme Court's interpretation of the Wilson and Webb–Kenyon Acts which followed as authorizing states to prohibit any direct ship-

ment which does not first pass through its three-tier system. But see *Adams Express Co. v. Kentucky,* 238 U.S. 190, 199–200, 35 S.Ct. 824, 59 L.Ed. 1267 (holding that the Webb–Kenyon Act was only applicable where the possession or consumption of alcohol was prohibited by state statute—if liquor was legal, then a direct shipment to the consumer was permissible).

lative history of relevant constitutional and Congressional authority firmly indicates an historical context of desiring to preserve a state's local option to remain prohibitionist. At the same time, the conclusion also follows that if a state, like Virginia, decided not to remain dry, it cannot "hide behind" legislative history to protect any discriminatory scheme.

The plaintiffs in *Bridenbaugh* complained that the state statutory scheme discriminated against out-of-state products because it permitted Indiana wholesalers and retailers to directly deliver intoxicating beverages to consumers' homes, 227 F.3d at 854 (citing Indiana Code ¶¶ 7.1–5–11–1.5(a); 7.1–3–13–3(a); 7.1–3–14–4(c)), but only after passing through an Indiana licensed wholesaler or retailer. *Id.* The Indiana "statutory scheme has its anomalies" where an out-of-state license holder is permitted "to ship directly to Indiana consumers by § 7.1–3–14–4(c), and [is] forbidden to do so by § 7.1–5–11–1.5." *Id.* The court declined. however, to comment on the disparity or otherwise reconcile it with its analysis, stating only that "Indiana's judiciary has yet to consider how, if at all, these statutes may be reconciled." *Id.* The court simply held that the statute requiring out-of-state producers to pass through the Indiana wholesale system was authorized by clause 2 "unless the state has used its power to impose a discriminatory condition on importation, one that favors Indiana sources of alcoholic beverages over sources in other states, as Hawaii did in *Bacchus.*" 227 F.3d at 853. In this case, Virginia's statutory scheme does just that by creating and preserving a preference for state-produced wine over out-of-state wine by allowing the direct shipment from the Virginia winery or off-premises licensee to the consumer on the one hand, with the commensurate economic advantage of convenient and expeditious marketing and delivery without price increase, while requiring out-of-state

sources to consign their goods only to in-state wholesalers or licensees, resulting in adverse economic impact including price increase because they are deprived of the benefit of direct-shipment. The Court finds the situation to be analogous to the discriminatory tax levied by Hawaii in *Bacchus* and therefore distinguishable from the Seventh Circuit's interpretation of the state statutory scheme in *Bridenbaugh.*

Furthermore, and clearly significant in further distinguishing this case from *Bridenbaugh.* the Virginia Supreme Court has addressed the specific issue involving a statutory preference for in-state producers and found it to be unconstitutional in violation of the dormant Commerce Clause. See *Heublein, Inc. v. Dep't of Alcoholic Beverage Control,* 237 Va. 192, 198, 376 S.E.2d 77, 80 (1989). The *Heublein* case is important not only because the Virginia Supreme Court struck down as unconstitutional an act that exempted Virginia farm wineries from the prohibitions of the Commerce Clause, but also because the Virginia Supreme Court made specific findings as to the General Assembly's motivation in passing the legislation. *Id.* In that case, Heublein, Inc., was a nationwide wine distributor that challenged the validity of Virginia's Wine Franchise Act which, notwithstanding the rights under existing contracts, retroactively limited an out-of-state supplier's ability to amend its contracts with Virginia wholesalers unless it amended all of its contracts in all states. *Id.* at 194, 376 S.E.2d 77. Not only did the statute require a supplier to have uniform agreements, it also exempted Virginia farm wineries from the restrictions of the Act. *Id.* at 195, 376 S.E.2d 77. The Virginia Supreme Court recognized that "every statute 'carries a strong presumption of validity' and unless it 'clearly violates a provision of the United States or Virginia Constitutions, we will

not invalidate it.'" *Id.* (citations omitted). Nevertheless, the court found that the statute clearly violated the Commerce Clause because it mandated a preference for in-state wineries over all others. *Id.* at 198, 376 S.E.2d 77.

Like the price affirmation statutes, the *Heublein* court held that the Virginia Wine Franchise Act attempted to force the control of commerce entirely outside of Virginia and was thus invalid. *Id.* (citing *Brown–Forman Distillers v. New York Liquor Auth.,* 476 U.S. at 584, 106 S.Ct. 2080). Next, the court held that "exempting Virginia farm wineries ... is a violation of the commerce clause because it discriminates against out-of-state wineries." *Id.* Having found that the Act was facially invalid, the Court then analyzed whether the statute served a legitimate government purpose or was otherwise authorized by the Twenty-first Amendment. *Id.* (citing *California Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. at 110). The court held that the exemption for Virginia farm wineries did not promote temperance or serve a legitimate interest unrelated to economic protectionism, but instead was specifically created for the purpose of fostering the local wine market. *Id.* at 198–199.[25] The court found accordingly that the exemption constituted an "invalid attempt to favor local wineries over out-of-state wineries in violation of the Commerce Clause." *Id.* at 199. Although the specific provision under challenge in *Heublein* is different from that under attack here, the Virginia Supreme Court's rationale is consistent with regard to the in-state preference allotted to the

Virginia wine industry for direct shipment and exclusive ABC store marketing.

This Court disagrees with the *Bridenbaugh* court's rejection of any need to analyze whether the Indiana statute in question addressed a "core concern" of the Twenty-first Amendment. Instead, the Seventh Circuit stated it was guided by the "text and history of the Constitution, not the 'purposes' or 'concerns' that may or may not have animated its drafters ... objective indicators supply the context for § 2; suppositions about mental processes are unilluminating." 227 F.3d at 850. In doing so, the court diverged from the evolving trend of Twenty-first Amendment and dormant Commerce Clause cases by favoring "the text and history of the Constitution" over consistent interpretation. *Id.* However, the Fourth Circuit has applied established constitutional analysis when it has been presented with Twenty-first Amendment issues, and this Court is bound by that interpretation and application which includes a core concern analysis in what must be viewed as a dormant Commerce Clause question. See *TFWS, Inc. v. Schaefer,* 242 F.3d 198, 212 (holding where state liquor laws violate the Sherman Act in contravention of the Commerce Clause, state liquor regulatory policies must "directly sene[ ] the interests it proffers under the Twenty-first Amendment,") citing *California Liquor Dealers Ass'n v. Midcal Aluminum, Inc.,* 445 U.S. 97, 109, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980)); *see also Bacchus Imports. Ltd. v. Dias,* 468 U.S. 263, 267, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984)).[26]

---

**25.** The court recounted the history of the Wine Franchise Act and other acts of the legislature such as amendments to expand local winery exclusions, the legislature's establishment of the Winegrowers Advisory Board, and its avowed policy to promote and

market Virginia wine. *See also* Va.Code Ann. § 3.1–1060 (establishing the Winegrowers Advisory Board).

**26.** *See* discussion of core concern analysis, *infra* at 46.

To accept the *Bridenbaugh* court's decision as dispositive would require explicit rejection of the applicability of the dormant Commerce Clause. Such a result would constitutionally marginalize and dismiss the dormant Commerce Clause on the basis that because it does not appear in the Constitution, it is only an inference that must be discarded. 227 F.3d at 849. That conclusion is unacceptable in light of the Supreme Court's decisions resolving the conflict between the Twenty-first Amendment and the rest of the Constitution.[27]

This Court chooses to abide by the rule of constitutional law that holds that "there is no principled basis on which to create a hierarchy of constitutional values." *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 484, 102 S.Ct. 752, 70 L.Ed.2d 700 (1982). It may be that the *Bridenbaugh* court simply deemed the dormant Commerce Clause inapplicable because it started from the premise that there was a lack of functional discrimination which diverted the traditional analysis. However, this Court rejects the concept that the dormant Commerce Clause lacks the force of the Constitution only because it does not explicitly appear in its text.

Defendants and Intervenor also cite extensively to *North Dakota v. United States* in support of their mutual positions. 495 U.S. at 424, 110 S.Ct. 1986. *North Dakota* involved a question under the Twenty-first Amendment and the Supremacy Clause (intergovernmental immunity and preemption doctrines) relating to state labeling and reporting laws applicable to all alcoholic beverages brought into the state—even onto federal enclaves—to prevent diversion. 495 U.S. at 426. The case is instructive in many ways, but not for all the propositions urged by the Defendants and Intervenor.

Of particular significance is that the Supreme Court was not confronted in *North Dakota* with a dormant Commerce Clause question. Rather, the focus was on the North Dakota system of regulation that required all out-of-state suppliers, including those shipping to federal enclaves, to report the amounts shipped into the state each month and affix labels to bottles not destined for state-licensees. The federal government challenged the reporting and labeling law under the Supremacy Clause to the Constitution. claiming the North Dakota statute had the effect of raising the price of liquor sold on federal property and that such an impact was in contravention of federal law. The Court found that the system of regulation by which North Da-

**27.** Although the Twenty-first Amendment limits the effect of the dormant Commerce Clause on a State's regulatory power over the delivery or use of intoxicating beverages within its borders, 'the Amendment does not license the States to ignore their obligations under other provisions of the Constitution.' *Capital Cities Cable, Inc. v. Crisp*, 467 U.S. 691, 712, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984). That general conclusion reflects our specific holdings that the Twenty-first Amendment does not in any way diminish the force of the Supremacy Clause, *Ibid.; California Retail Liquor Dealers Assn. v. Midcal Aluminum, Inc.*, 445 U.S. 97, 112–114, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980), the Establish-

ment Clause, *Larkin v. Grendel's Den. Inc.*, 459 U.S. 116, 122, n. 5, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982), or the Equal Protection Clause, *Craig v. Borer*, 429 U.S. 190, 209, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976). We see no reason why the First Amendment should not also be included in that list. Accordingly, we now hold that the Twenty-first Amendment does not qualify the constitutional prohibition against laws abridging the freedom of speech embodied in the First Amendment. The Twenty-first Amendment, therefore, "cannot save Rhode Island's ban on liquor price advertising." *44 Liquormart v. Rhode Island*, 517 U.S. at 484.

kota chose to enforce liquor distribution within in its jurisdiction was "unquestionably legitimate," that the labeling and reporting laws served the legitimate purpose of preventing diversion, were not tantamount to state regulation of the federal government or discrimination against it, and that the state's legitimate interests are entitled to a strong presumption of validity. Id. at 432—433. The Court explained that among the state's core powers under the Twenty-first Amendment was the state's power to prevent diversion by enforcing both reporting and labeling requirements on out of-state suppliers of alcoholic beverages to military posts. Id.

While the Court analyzed the facts under the principles of the Supremacy Clause, it also expressly considered whether reporting and labeling laws constituted direct regulation of the United States or discrimination against the federal government and "those with whom it deals." Id. at 435. Since the law regulated suppliers and not the government, the Court found that the laws did comprise direct regulation of the United States. Id. at 437–438. However, since the law affected the government's suppliers of alcohol, the law must be "imposed equally on other similarly situated constituents" in its broad context. Id. at 438. Labels were not required of suppliers whose products passed through North Dakota's licensees, but the Court found that the labeling and reporting restriction were part of an "extensive system of statewide regulation" that furthered legitimate interests in promoting

temperance, preventing diversion and raising revenue. Id. at 439. Although in-state wholesalers were not subject to the reporting and labeling law, all in-state retailers were still required to obtain all alcoholic beverages from in-state sources. The federal government was therefore free to choose to purchase its liquor from out-of-state wholesalers who abided by the labeling and reporting requirements instead of in-state wholesalers. Id. Because the United States did not suffer an adverse, economic impact compared to in-state retailers, the Court found that the regulatory regime was not discriminatory under the economic burden concept of the Supremacy Clause. Id. The Court also considered whether a federal law requiring the Department of Defense to obtain alcoholic beverages[28] from the most competitive source operated to exempt the regulation from state taxation. Id.; see 10 U.S.C. § 2488. The Court held that incidental increases in price did not impair the military's ability to secure liquor at the most competitive price. Id. at 440.[29]

The problem with rote application of North Dakota v. United States to this case is that such an analysis suggests that one should go no further than to recognize that a state is afforded "special protection" in setting liquor control policies within its jurisdiction and that those policies enjoy "a strong presumption of validity" that "should not be set aside lightly." Id. at 433. A closer analysis, however, includes the caveat that although such policies and implementing laws "should not be set aside

28. The law required that beer and wine be purchased from only in-state sources which has been interpreted to apply only to installations in Alaska and Hawaii.

29. One of the most interesting aspects of the North Dakota case is that it confirms that North Dakota found a way to tax interstate commerce occurring wholly outside the state by instituting a labeling and reporting requirement pursuant to its clause 2 powers. At the very least, the Court finds the case is instructive because it demonstrates that a state can monitor the direct shipment of goods, including liquor, into the state and require such imports to bear labels to prevent diversion without having to implement a full scale bar to all importation through discriminatory means.

lightly," they can and must be invalidated in the face of constitutional infirmity Though substantial conflicts were resolved between the state of North Dakota and the United States in *North Dakota* to enforce labeling and reporting requirements, the primary issues were focused on the application of intergovernmental immunity doctrine, the Supremacy Clause, and federal preemption—not a facially-discriminatory statutory scheme as here. The Supreme Court held North Dakota's reporting and labeling taws were permissible in the interest of promoting temperance and preventing diversion, but the Court never sanctioned discriminatory barriers to trade.

At the same time, the *North Dakota* case has significance to this case, but not as the Defendant and Intervenor would have one believe. Under the force of the Commerce Clause, the Supreme Court has held elsewhere that a state has no right under the Twenty-first Amendment to prevent the shipment of intoxicating liquors onto a military installation or to require such beverages to pass through its tier system. *United States v. State Tax Comm'n of Mississippi*, 412 U.S. 363, 375–376, 93 S.Ct. 2183, 37 L.Ed.2d 1 (1973) (holding Mississippi lacked jurisdiction to regulate the importation of intoxicating liquors into federal enclaves). Accordingly, it is appropriate to conclude that the Court applied a different analysis in *North Dakota* than it would have had the question before it been whether it was permissible for the state to erect a barrier to interstate commerce. *City of Philadelphia v. New Jersey*, 437 U.S. at 623–624, 98 S.Ct. 2531.

Another case decision urged by the Defendants and Intervenor in support of their position is *Kronheim v. District of Columbia* which the Defendants and Intervenors argue supports a finding in their favor because the court there recognized " 'the plenary power [of the states] to reg-

ulate and control … the distribution, use, or consumption of intoxicants within her territory after they have been imported.' " 91 F.3d 193, 203 (D.C.Cir.1996)(Defs.' Am. Mem. in Supp. of Mot. Summ. J. at 45). Like *Bridenbaugh,* the *Kronheim* case is outside of this judicial appellate circuit and is therefore not binding—especially in light of the adequate precedent available from the Supreme Court and Fourth Circuit on the relevant issues. The question in *Kronheim* was whether it was constitutional for the District of Columbia to impose a local warehousing requirement upon all liquor imported by wholesalers licensed by the District. The Court of Appeals for the D.C. Circuit held that the dormant Commerce Clause was implicated by the question presented and applied the very same analysis discussed throughout this report and recommendation. *Id.* As in this case, applying the strict scrutiny analysis, the *Kronheim* court held that the statute—the local warehousing requirement -was facially discriminatory and thus per se invalid. *Id.* As it was required to do, the court examined whether the local purpose offered by defendants was legitimate and could not be adequately served by reasonable nondiscriminatory means, *Id.* (citing *New Energy Co. of Indiana v. Limbach,* 486 U.S. 269, 108 S.Ct. 1803, 100 L.Ed.2d 302 (1988)).

The Defendants would have the Court look only at the result of this case and ignore the analysis. The defendants in *Kronheim* argued that there were two local purposes advanced by the discriminatory statute in question: (1) the "storage requirement serves important inspection and enforcement interest"; and (2) "the storage requirement is integral to both maintaining its 'three tier system of distribution,' which strictly separates the function of supplier, wholesaler and retailer, and discouraging the creation of a 'tied house,' in which one firm controls

the entire chain of distribution." *Id.* at 202. The court acknowledged that Kronheim could credibly argue that the "local warehousing requirement is protectionist ... we cannot say with any assuredness that protectionism is not a purpose of the legislation." *Id.* at 203. However, the court found that even though the legislature's motive was mixed, both for protectionist and for legitimate purposes, the "nonprotectionist side of the District's mixed motive placed [it] squarely within the [Twenty-first] Amendment's ambit." *Id.* However., in the Fourth Circuit, a discriminatory state statute or regulation that does not directly serve the state interest proffered is unconstitutional.[30]

The D.C. Circuit abruptly ended its inquiry in *Kronheim* by deciding that the legitimate interests within the Twenty-first Amendment's core concerns outweighed the illegitimate protectionism involved without adequately analyzing whether the enforcement concerns could be achieved by non-discriminatory means. *Id.* at 203–204. The premature end to the analysis is inconsistent with this Court's understanding of dormant Commerce Clause jurisprudence that must be applied in cases such as the present one. Because *Kronheim v. District of Columbia* does not go far enough in its analysis, is relatively fact-specific, and because it is not binding in this case, the Court finds its conclusion to be inapplicable. However, at the same time, the decision does provide some support for the Plaintiffs' position, but not the Defendants' or Intervenor's, in that although the *Kronheim* court found that the statute in question ultimately survived the dormant Commerce Clause analysis, it nevertheless held that it had to be analyzed under the dormant Commerce

Clause strict scrutiny standard. 90 F.3d at 201–202.

The present case is not a resale price maintenance case, it is much less complicated. However, because of the Twenty-first Amendment, it is not a garden-variety Commerce Clause case either. The Twenty-first Amendment's plain language gives states the "control over the 'transportation or importation' of liquor into their territories" which "logically entails considerable regulatory power not strictly limited to importing and transporting alcohol." *California Retail Liquor Dealers Ass'n. v. Midcal Aluminum Inc.,* 445 U.S. 97, 107, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980) (striking down California's wine price maintenance statute as violative of the Sherman Act). But both the Defendants and Intervenor misread the Supreme Court's holding in *Midcal* and seemingly ignore later decisions that clarify the Supreme Court's interpretation of the Twenty first Amendment's limitations in light of the Commerce Clause.

First, the *Midcal* court first looked at the Twenty-first amendment by interpreting the "language of the provision rather than the history behind it" and found that the states enjoyed an explicit grant of authority. *Id.* at 106–107. Next, the court explored the early decisions that interpreted the Twenty-first Amendment as holding "each State holds great powers over the importation of liquor from other jurisdictions," but it specifically refused to agree that " § 2 'freed the States from all restrictions upon the police power to be found in other provisions of the Constitution.'" *Id.* at 107–108, (citing *State Board v. Young's Market Co.,* 299 U.S. 59, 63–64, 57 S.Ct. 77, 81 L.Ed. 38 (1936)). The court cited cases that held "important federal interests in liquor matters survived the

---

**30.** See *TFWS, Inc. v. Schaefer,* 242 F.3d 198, 212 (4th Cir.2001) (striking down state liquor regulation which did not "directly serve the interests it proffers under the Twenty-first Amendment").

ratification of the Twenty-first Amendment." *Id.* (citing *Dep't of Revenue v. James Beam Co.,* 377 U.S. 341, 84 S.Ct. 1247, 12 L.Ed.2d 362 (1964); *Craig v. Boren,* 429 U.S. 190, 97 S.Ct. 451, 50 L.Ed.2d 397 (1976); and *Wisconsin v. Constantineau,* 400 U.S. 433, 91 S.Ct. 507, 27 L.Ed.2d 515 (1971)) [31] Again, the Defendants and Intervenor cite to *Midcal* and yet still urge the Court to forego a traditional dormant Commerce Clause analysis as did the count in *Bridenbaugh* in which the Seventh Circuit did not conduct the full analysis because it held no functional discrimination existed ("Indiana insists every that every drop of liquor pass through its three tiered system . . . [w]ine originating in California, France, Australia, or Indiana passes through the same three tiers and is subject to the same taxes."). 227 F.3d at 853.

As Justice Stevens observed in his dissent in *City of Newport v. Iacobucci,* the problem with straying from a firmly-established constitutional analysis is that it leads to internal inconsistency. 479 U.S. at 99–100. In balancing the Twenty-first Amendment against the First Amendment, the Court has a duty "to 'assess the substantiality of the governmental interests asserted [and] determine whether those interests could be served by means that would be less intrusive on activity protected by the First Amendment.'" *id.* (citing *Schad v. Mount Ephraim,* 452 U.S. 61, 70, 101 S.Ct. 2176, 68 L.Ed.2d 671 (1981)). This has likewise been observed by the Supreme Court of Virginia: "'there is no bright line between federal interests and state powers over liquor . . .' [t]he competing state and federal interests can be reconciled only after careful scrutiny of those concerns in a 'concrete case.'" *Heublein, Inc. v. Dep't of Alcoholic Beverage Control,* 237 Va. 192, 198, 376 S.E.2d 77, 80 (1989) (quoting *California Liquor Dealers Ass'n. v. Midcal Aluminum Inc.,* 445 U.S. 97, 110, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980)).

### Federal Statutory Analysis

The Defendants and Intervenor argue that the ABC Act its not only expressly saved by Section 2 of the Twenty-first Amendment, it is also expressly authorized by the Wilson Act, the Webb–Kenyon Act, the Federal Alcohol Administration Act and the Twenty-first Amendment Enforcement Act. To find that Congress has authorized the challenged state action, congressional intent must be "unmistakably clear" and "expressly stated." *South–Central Timber Dev., Inc. v. Wunnicke,* 467 U.S. 82, 91, 104 S.Ct. 2237, 81 L.Ed.2d 71 (1984) (holding that "Congress affirmatively contemplate otherwise invalid legislation is mandated by the policies underlying dormant Commerce Clause doctrine.. 'to avoid the tendencies toward economic Balkanization that had plagued relations among the Colonies and later among the States under the Articles of Confederation.'") (citations omitted). In fact, Congress has never in any law exempted intoxicating liquors from the realm of interstate commerce, although it has obviously authorized that commerce in liquor products can be addressed in special ways. In no law has Congress expressly authorized discrimination, and, in

---

**31.** The Court also cited *Joseph E. Seagram & Sons. Inc. v. Hostetter,* 384 U.S. at 35, to support the premise that the Court has "given 'wide latitude' to state liquor regulation" on which the defendants rely to support the statement that states have "virtually complete control over whether to permit importation and sale of liquor and how to structure the liquor distribution system." *California Liquor Dealers Ass'n. v. Midcal Aluminum, Inc.,* 445 U.S. at 110, 100 S.Ct. 937. The Court later overruled *Joseph E. Seagram & Sons, Inc. v. Hostetter,* however, to the extent that the discriminatory nature of a state law causes it to lose the protection of the Twenty-first Amendment. *Healy v. Beer Inst.,* 491 U.S. at 342.

fact, the Twenty-first Amendment Enforcement Act of recent vintage specifically denies to the states any power in excess of that which states already possessed as decreed by the Supreme Court. 27 U.S.C. § 122a(e)(1) & (2).

The Wilson, Webb–Kenyon, and Federal Alcohol Administration Acts comprise the bulk off the federal statutes that regulate intoxicating beverages.[32] Codified at Title 27 of the United States Code, these acts provide federal regulation of intoxicating liquors in two parts: (1) Transportation in Interstate Commerce, §§ 121—122; and (2) Federal Alcohol Administration, § § 201—219(a).[33]

The regulations promulgated pursuant to Title 27 are voluminous and address everything from the federal regulation of the types of premises upon which a producer may establish a manufacturing plant to federal taxation of alcoholic products from point of origin to ultimate consumption. *See, e.g.*, 26 U.S.C. §§ 5001, 7652; 27 C.F.R. §§ 19.21–26,19.46–53, 19.152; and parts 22 (tax-free alcohol) and 194 (liquor dealers). The regulations strictly regulate, among other things, the proper methods for producing, storing, labeling, distributing, bonding and disposing of wine, beer and distilled spirits, including how instruments are to be gauged and stan-dards for weights and measures of intoxicating liquor. 27 C.F.R. parts 24, 25 and 30.[34]

### The Wilson Act

The Supreme Court held in *Leisy v. Hardin*, 135 U.S. 100, 10 S.Ct. 681, 34 L.Ed. 128 (1890), that the states could not prohibit the importation of alcohol "in the absence of Congressional permission." 135 U.S. at 124–125. Congress enacted the Wilson Act in direct response to that decision in order to define when state statutes are operative. Section 121 therefore provides:

All fermented, distilled, or other intoxicating liquors or liquids transported into any State or Territory or remaining therein for use, consumption, sale, or storage therein, shall upon arrival in such State or Territory be subject to the operation and effect of the laws of such State or Territory enacted in the exercise of its police powers, to the same extent an in the same manner as though such liquids or liquors had been produced in such State or Territory, and shall not be exempt therefrom by reason of being introduced in original packages or otherwise.

27 U.S.C. § 121.

The statute permits the state, in an exercise of its police power, to regulate alco-

---

**32.** The combined legislation comprises one of the shortest titles in the United States Code. Both the Wilson and Webb–Kenyon Acts were enacted prior to passage of the Eighteenth Amendment. They were "re-enacted" along with the passage of the Twenty-first Amendment to allow "dry states" to remain so following the repeal of national prohibition. Of course, Virginia chose not to remain dry.

**33.** Though not relevant here, Title 26 of the United States Code governing the Internal Revenue Service also contains provisions for taxation relating to intoxicating liquors.

**34.** Congress has expressed a particular concern with national conformity of labeling in order to inform the public "about the health hazards that may result from the consumption or abuse of alcoholic beverages ..." 27 U.S.C. § 213. In fact, "[i]t is therefore the policy of the Federal Government in promoting the health and safety of the Nation's population... to exercise the full reach of [its] constitutional powers in order to establish a comprehensive Federal program..." to provide warnings "not impeded by diverse, non-uniform, and confusing requirements for warnings or other information on alcoholic beverage containers ... sold in interstate commerce; but not .... within a single State." *Id.*

hol traffic after the liquor is transported into the state in interstate commerce as if it were a product that had been produced within the state. The Wilson Act "simply removed an impediment to the enforcement of the state laws in respect to imposed packages in their original condition." *In re Rahrer*, 140 U.S. 545, 11 S.Ct. 865, 35 L.Ed. 572 (1891) (holding the Wilson Act constitutional). However, the Wilson Act did not prevent the shipment of alcoholic products in interstate commerce to an ultimate purchaser as long as the purchaser did not make a available for resale in violation of state law and, therefore, it does not have a direct impact on the statutory scheme under consideration. *Rhodes v. Iowa*, 170 U.S. 412, 18 S.Ct. 664, 42 L.Ed. 1088 (1898).

### The Webb–Kenyon Act

Congress later passed the Webb–Kenyon Act as a further aid to the states "to extend the prohibition against the introduction of liquors into the states by means of interstate commerce." *Adams Express Co. v. Kentucky*, 238 U.S. at 199 (interpreting as meaningless the title of the Act that indicates it divests liquor of its interstate character in certain cases where the language of the provision could not "more plainly indicate the purpose of Congress [was] not to prohibit all interstate shipment of liquor into so-called dry territory, and to render the prohibition of the statute operative only where the liquor is to be dealt with in violation of the local law of the state ... such shipments are prohibited only when such person intends that they shall be possessed, sold, or used in violation of any law of the state wherein received.") The purpose of the Act was to allow dry states to prohibit the importation of liquor if the manufacture, possession and consumption of liquor was totally prohibited in those states. Cong. Rec. 2792 (Feb. 8, 1913); and Con-. Rec. 2914 (Feb. 10, 1913).

Section 122 of the Act therefore provides in pertinent part:

> The shipment or transportation, in any manner or by any means whatsoever, of any spirituous, vinous, malted, fermented, or other intoxicating liquor of any kind from one State ... or from any foreign country into any State ... which said spirituous, vinous, malted, fermented, or other intoxicating liquor is intended, by any person interested therein, to be received, possessed, sold, or in any manner used, either in the original package or otherwise, in violation of any law of such State ... is prohibited.

27 U.S.C. § 122.

By interpreting the shipment of liquor via a common carrier from an out-of-state supplier directly to a consumer as an interstate transaction, the Supreme Court held that the Webb–Kenyon Act "has no application and no effect to change the general rule that states may not regulate commerce wholly interstate." *Adams Express Co. v. Kentucky*, 238 U.S. at 202, 35 S.Ct. 824 (also holding the common carrier was "bound before delivery ... to be circumspect and to use ordinary care to learn the purpose for which it was to be used.")[35] The legislative history and the Supreme Court's interpretation of the Act therefore result in the conclusion that the purpose of the Webb–Kenyon Act was to allow dry states to remain so by prohibiting direct shipment in interstate commerce—a right

---

**35.** The Supreme Court has also relied on the reasoning and legislative history of alcohol regulation in Kentucky where the consumption of liquor had always been legal, noting that the Kentucky Court of Appeals even held that possession and personal use of liquor "for his own comfort" was an individual's constitutional right, provided it did not interfere with the rights of others. *Adams Express Co. v. Kentucky*, 238 U.S. at 200–201, 35 S.Ct. 824. Only in America.

the state would not otherwise have under the Commerce Clause without the specific authority of Congress. Of course, Virginia chose a different course and the Webb–Kenyon Act is therefore of no avail to the Defendants and Intervenor.

### The Federal Alcohol Administration Act

Sections 201 through 219a of Title 27 comprise what is known as the Federal Alcohol Administration Act, vesting the Secretary of the Treasury with enforcement powers and creating the Bureau of Alcohol. Tobacco and Firearms. The Act's purpose is "to regulate interstate and foreign commerce in distilled spirits, wine, and malt beverages, to enforce the Twenty-first Amendment- and to protect the revenue and enforce the postal laws with respect to distilled spirits, wine, and malt beverages" by establishing a basic permit scheme to accomplish its goal. 27 U.S.C. § 203. Sections 203(a)(1)-(2) make it unlawful, except by federal permit, to import, or, for an importer to sell or transport intoxicating liquors—directly or indirectly—in interstate or foreign commerce. Sections 203(b)(1)-(2) require a federal permit in order to produce, bottle, warehouse, or, for such producer to sell to sell or transport intoxicating liquors—directly or indirectly— in interstate or foreign commerce. Sections 203(c)(1)-(2) require a federal permit to purchase intoxicating liquors for resale at wholesale, or, for such a retailer to sell to sell or transport intoxicating liquors—directly or indirectly—in interstate or foreign commerce, The statute specifically exempts from the permit requirements "any agency of a State or political subdivision thereof" and its agents.

Section 204(a)(1)-(2) defines persons who are entitled to be issued basic permits and § 204(b) sets out a due process appeal when a permit is refused. Permits may be refused upon a finding by the Secretary of the Treasury that the applicant or, with respect to corporate applicants, any officer, director or major stockholder, has a state or federal felony conviction within the previous five years or a misdemeanor conviction within three years. The statute grants further discretion in the Secretary to allow refusal of a permit if it is likely that the applicant's business experience, financial standing, or trade connection is not likely to allow for operation to begin in a timely way or for operations to be maintained in compliance with the law. 27 U.S.C. 204(a)(1)-(2).

Notably, § 205 addresses "unfair competition and unlawful practices" and is a clear Congressional emphasis on the competitive nature of interstate commerce as it relates to "any person engaged in business as a distiller, brewer, rectifier, blender, or other producers, or as an importer or wholesaler, of [intoxicating liquors] or as a bottler, or warehouseman and bottler, of distilled spirits, directly or indirectly or through an affiliate." 27 U.S.C. § 205. The section prohibits such a person from engaging in exclusive agreements while engaging in interstate commerce or any practice that has a restrictive effect on interstate commerce. 27 U.S.C. 205(a). "Tied houses," also prohibited by the statute, are structural inducements designed to cause exclusivity such as a manufacturer holding a license or interest in the retailer itself or its premises; acquiring interest in real property owned, occupied, or used by a retailer in the conduct of his business or by furnishing the retailer with anything of value; by paying or crediting the retailer for advertising and promotions; by guaranteeing a loan; by extending extraordinary credit; or by requiring the retailer to take and dispose of a product quota. 27 U.S.C. § 205(b); 27 C.F.R. §§ 6.1—6.153.[36] Among other

---

**36.** In the C.F.R. sections relating to Title 27, there are also instances where the regula-

things, the statute further prohibits commercial bribery that restrains activity in interstate commerce; consignment sales agreements (other than bona fide returns after a sale) as they substantially restrain interstate and foreign commerce; and deceptive advertising. 27 U.S.C. § 205(c)-(d), (f). The statute includes a substantial and strict labeling requirement that addresses both consumer protection and promotion of interstate commerce. 27 U.S.C. § 205(e); 27 C.F.R. Ch. 1, Part 4. The Act also includes several criminal offenses relating to bulk sales, bottling and interlocking directorates.[37] 27 U.S.C. §§ 206—207. Accordingly, it is clear that the Federal Alcohol Administration Act does not sanctify or shield the state action at issue in this case.

### The Twenty-first Amendment Enforcement Act of 2000

On October 28, 2000, President Clinton signed into law a congressional amendment to Title 27 that includes a provision that Defendants read as having "clearly and positively spoke[n] to the issue of alcoholic beverage commerce in the states, thereby rendering the 'dormant' or 'negative' Commerce Clause inapplicable." (Defs.' Am Mot. in Supp. of Summ. J. at 2); *see* Pub.L. 106–386, effective Jan. 25,2001; codified at 27 U.S.C. § 122a. The Act creates a civil cause of action to enforce state laws in federal court by way of injunction.

However, § § 2(e)(1) & (2) of the Act specify that the statute is to be construed as applicable to state law as *the Twenty-first Amendment has been interpreted by the Supreme Court*, including as it relates to other constitutional provisions. Therefore, the statute cannot possibly be interpreted as the Defendants assert as "render[ing] the 'dormant' or 'negative' Commerce Clause inapplicable." (Defs.' Am. Mem. at 2). Although the legislative history of the Act includes communications from many state attorneys general (including the Attorney General of Virginia) that support the need for the statute in order to prevent, among other things, underage drinking and driving, the plain language of the statute creates only a federal forum for states to seek injunctive relief to enforce their otherwise valid constitutional statutes relating to intoxicating beverages.

### Dormant Commerce Clause Not Pre–Empted

Barriers to trade are analyzed under the dormant Commerce Clause where Congress has not acted. The Defendants and Intervenor argue that Congress "clearly and positively spoke to the issue of alcoholic beverage commerce in the states, thereby rendering" the dormant Commerce Clause inapplicable. (Def.'s Mem. in Opp'n to Pls.' Mot. Summ. J. at 4).[38] However, this Court concludes that while Congress has expressly exercised its

tions' scope specifically note that compliance with the federal regulation does not "exempt any person from the requirements of any State law or regulation." 27 C.F.R. § 6.1.

**37.** Bulk sales are sales of intoxicating liquors in containers of more than one wine gallon or a liquid measure of 231 cubic inches. 27 C.F.R. §§ 1.10, 4.10. An interlocking directorate occurs when an individual is an officer or director in more than one company engaged in the production of alcoholic beverages. 27 U.S.C. § 208(a). With a few exceptions, an interlocking directorate is forbidden in order to prevent any restraint or limit in competition in interstate or foreign commerce.

**38.** Lamenting the derogation of the broad power of regulation once thought endemic to the Twenty-first Amendment, Justice Stevens observed the "decisions of *Brown–Forman* and *Bacchus* demonstrate, however, that [the Twenty-first Amendment] is toothless except when freedom of speech is involved." *City of Newport v. Iacobucci*, 479 U.S. at 99 (Stevens, J., dissenting). Justice Stevens also criticized the *City of Newport* court for its decision in light of its rejection of "the notion that a State may 'exercise its power under the Twenty-first Amendment in a way which impinges on the Establishment Clause ...'" *Id.* (citing *Larkin v. Grendel's Den. Inc.*, 459 U.S. 116, 122, n. 5, 103 S.Ct. 505, 74 L.Ed.2d 297 (1982)).

Commerce Clause power to regulate interstate and foreign commerce in alcoholic beverages, including licensing, labeling, integration, and other areas including importation and distribution, it has never abdicated to the states its power nor has it expressly and unmistakably legislated authorization for the states to erect unconstitutional barriers involving the free flow of commerce, including that involving alcoholic products, *See generally,* Title 27, United States Code.

## Core Concerns

If the state can articulate that it has a legitimate state interest under the core concerns of the Twenty-first Amendment that are unrelated to economic protectionism and can demonstrate that there are no other nondiscriminatory means of accomplishing the same legitimate goals, then the statutory scheme will survive the strict scrutiny analysis. *Hunt v. Washington State Apple Adver. Comm'n,* 432 U.S. at 353, 97 S.Ct. 2434; *Capital Cities Cable, Inc. v. Crisp,* 467 U.S. 691, 714, 104 S.Ct. 2694, 81 L.Ed.2d 580 (1984) (analyzing "whether the interests implicated by a state regulation are so closely related to the powers reserved by the Twenty-first Amendment that the regulation may prevail, not withstanding that its requirements directly conflict with express federal policies"). If, however, the state cannot show that the statutes are designed to promote the core concerns of the Twenty first Amendment or such concerns are overshadowed by economic considerations, the statutory scheme is rendered unconstitutional. See *TFWS, Inc. v. Schaefer,* 242 F.3d 198, 212 (4th Cir.2001) (holding where state liquor laws violate the Sherman Act in contravention of the Commerce Clause, state liquor regulatory policies must "directly serve[ ] the interests it proffers un-

der the Twenty-first Amendment," citing *California Liquor Dealers Ass'n v. Midcal Aluminum, Inc.* 445 U.S. 97, 109, 100 S.Ct. 937, 63 L.Ed.2d 233 (1980)). In addition, if the state shows legitimacy, but the court finds that there are other nondiscriminatory means of accomplishing the same goals, then the statutory scheme will likewise fail. *Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 267, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984); *North Dakota v. United States,* 495 U.S. at 432 (holding that states possessed the power to promote temperance through regulation); *South Dakota v. Dole,* 483 U.S. at 210, 107 S.Ct. 2793 (while not a core power itself, states set the *minimum* drinking age and Congress may create a funding incentive under its spending power to induce states to conform with a national minimum drinking age).

Virginia's interest in temperance is firmly rooted in the history of the ABC Act as well as the Twenty-first Amendment. In its promotion of temperance, Defendants argue that it has "virtually limitless" state control over the distribution process as its core power under the Twenty-first Amendment. (Defs.' Am. Mem. at 37–40). The state clearly has authority to regulate the importation and, distribution of liquor consistent with its Twenty-first Amendment authority and the legitimate exercise of its police powers. However, Defendants propose an interpretation of limitless regulation, regardless of other constitutional provisions and specific acts of Congress. That concept is too restrictive where, at best, the Supreme Court has relied on the tenet that the state has " 'virtually complete control' over the importation and sale of liquor and the structure of the liquor distribution system," but that its *carte blanche* only extends *"within the area of its jurisdiction." North Dakota v. United States,* 495 U.S. at 432 (emphasis added).[39]

**39.** Intervenor misstates that the Plaintiff is the party with the burden to prove that Virgi-

nia could accomplish its legitimate goals

When Virginia's ABC Act was originally enacted in 1933 and it adopted its General Principles for state liquor control, temperance was the first item on the list. While promotion of temperance through strict control is a legitimate state interest, Virginia's professed interest in this core concern as justification for the subject statutory scheme is fraught with contradictions that lead the Court to conclude its means are not justified by its temperance policy. For instance, on the one hand, the ABC stores purvey a variety of distilled spirits that are produced both domestically and internationally. The stores do not carry all brands of distilled spirits that a consumer may wish to purchase but, if available, special orders can be placed if the consumer agrees to purchase a full case, a dozen 750 milliliter bottles. This scenario obviously has one of two practical effects. The consumer will either abandon his or her search for the brand of choice because of the large quantity required for a special order or the consumer will capitulate to the requirement and order the full case. If the consumer chooses the former, the state may have achieved a temporary goal of promoting temperance with respect to a certain brand—but there is no reason to believe that the consumer will abandon his or her desire for the variety of liquor being sought. If the consumer chooses the latter course, then the state has woefully failed to promote temperance by forcing a consumer to buy a whole case of hard liquor. Either way, it is a fiction to argue that this arrangement promotes temperance. It may make business sense to preserve the state's monopoly on liquor, but the policy cannot reasonably promote temperance.[40]

It is also a legitimate concern, of course, that the Commonwealth be able to collect taxes on sales of alcoholic beverages to fund ABC operations, prevention and enforcement activities. However, such a concern cannot be the driving force behind the statutory scheme. While the Plaintiff wineries profess that they will "collect and remit to Virginia the taxes arising" out of the interstate shipment of wine (Am. Compl. at 23, 52), the Commonwealth is concerned not only because of the difficulty in collecting state-levied taxes from out-of-state entities, but also because it has no right to collect such sales taxes extraterritorially. *Quill Corp. v. North Dakota*, 504 U.S. at 309. Virginia's concern is well-taken in this regard; however, this concern operates to debase the argument that the ban on importation is anything more than economic protectionism which, of course, is a prohibited rationale for upholding the statutory scheme in the face of the Commerce Clause.

### Distilled Spirits Direct Shipment Prohibition

The Plaintiffs' efforts to fashion their arguments regarding the importation and distribution of distilled spirits (hard liquor) into a dormant Commerce Clause question must fail under a consistent application of

through nondiscriminatory means. (Intervenor–Defendant Mem. in Supp. of Mot. Summ. J. at 22). Once Plaintiffs have met their burden on the facial challenge to the ban on out-of-state direct shipments as they have, it is Defendants' burden to prove that there is no other nondiscriminatory means of accomplishing its duty. *See Waste Mgmt. Holdings v. Gilmore*, 87 F.Supp.2d 536, 544 (holding that it was the state's duty to show that no reasonable alternatives existed), aff'd, 252

F.3d 316, 2001 WL 604325 (confirming the burden is on the defendant).

**40.** It may be that a consumer may not be able to persuade an out-of-state manufacturer or distributor of their preferred brand of hard liquor to direct ship by the bottle if the direct shipment ban were not in effect, but if so, it would be a permissible commercial decision made in the free market arena unrestrained by a state-erected barrier to interstate commerce.

the required constitutional analysis, While it may be frustrating to consumers that they may not be able to seek out, bargain for, and purchase by direct shipment, goods of their choosing in quantities they desire, the requirement that all distilled spirits pass through the state-controlled three-tier system is required of all distilled spirits, regardless of the source. Therefore, that part of the statutory scheme, dealing with distilled spirits, is neutral on its face and does not present a dormant Commerce Clause issue because in-state and out-of-state entities are treated exactly the same. Accordingly, because there is no local preference and instate competitors must enter the market in the same way as out-of-state sources of hard liquor, there is no discriminatory impact and hence no constitutional dilemma While it is true that Virginia consumers are deprived of the ability to purchase the distilled spirits of their choosing directly from a vendor for direct shipment to their homes, any reasonable balancing test must result in the conclusion that the impact on interstate commerce is not "clearly excessive in relation to the putative local benefits" *Pike v. Bruce Church, Inc.,* 397 U.S. 137, 142, 90 S.Ct. 844, 25 L.Ed.2d 174 (1970).

Therefore, it is unnecessary to consider whether there are other nondiscriminatory means of addressing the legitimate state concerns of promoting temperance, inspection and tax activities while preventing diversion and illegal possession and consumption as touted as the objectives of the three-tiered system. Moreover, even if such an analysis were involved, the required acceptance of the factually-based assertions of the Defendants and Intervenor on the purposes of the three-tier system so as to establish a genuine dispute as to material fact are enough to preclude summary judgment.[41] Accordingly, this Court finds that the state statutory scheme regarding distilled spirits to be constitutional.

### In-state Wine and Beer Preference

Though Virginia's alcoholic beverage control regulations serve many legitimate interests such as promoting temperance, preventing diversion and collecting taxes, the preference for instate producers and local markets with respect to direct shipments of wine and beer does not serve this end. *Heublein, Inc. v. Dep't of Alcoholic Beverage Control,* 237 Va. at 199, 376 S.E.2d 77. While the state undoubtedly has an interest in preventing all of the alcohol-related abuses it enumerates in its arguments, the preference for in-state wineries and breweries cannot be sustained because it is but a pretext for exclusion. Defendants and Intervenor advance what appears to be a cogent argument that be-

---

**41.** At the same time, factual issues raised by or at least reasonably inferred from the Plaintiffs' assertions likewise present a genuine dispute of material fact so as to preclude summary judgment on the issue of whether there are other nondiscriminatory means to achieve the same legitimate objectives involving the distribution of distilled spirits if the issue was to be reached in the analysis. For example, there is the basis to assert on the strength of the *North Dakota* precedent alone that there are other nondiscriminatory means to achieve the same legitimate goals whereby, for example, the state may properly demand that the common carriers that deliver the direct shipments hand deliver to a person and confirm that the recipient is a person of legal drinking age before relinquishing control of the alcoholic beverages. There is no practical difference from requiring such a procedure and that required of store clerks or bartenders who regularly check customers for valid identification to verify age before allowing the sale of alcoholic beverages. Furthermore, common carriers routinely are required by the terms of some delivery agreements to hand-deliver packages to the named recipient, to see picture identification, and to obtain signature. In any event, it is not necessary or appropriate to evaluate such alternatives in this analysis.

cause Virginia licensees are subject to inspection and enforcement, the ABC can monitor and prevent such things as direct-shipment sales to minors and distribution of adulterated beverages. However, in-state direct shipments are subject to the same perils as out-of-state shipments, and the Defendants and Intervenor are not arguing that there are any problems in regard to the state's legitimate core concerns with the former system. The Defendants would have the Court believe that the only way to enforce Virginia's drinking age, purity and diversion laws is by forbidding out-of-state direct shipments because those business premises cannot be physically monitored by Virginia ABC Agents. However, their arguments ring hollow because of the apparent lack of any problems with existing in-state direct shipments and the fact that the degree of control that is exercised under the state's authority of inspection in regard to the instate preference is significantly less than what exists in regard to the full force of the three-tier system that applies to all out-of-state sources. Though the Court finds that enforcement is a valid and important concern, banning direct shipments from out-of-state while permitting the same activity in-state is not the only means of exercising the state's police power and performing its public safety duty. *See Bacchus Imports, Ltd. v. Dias,* 468 U.S. at 272, 104 S.Ct. 3049.

Furthermore, the existence and activities of the Winegrowers Advisory Board cannot be disguised. It is comprised of officers appointed by the Governor and includes as an ex officio member the Chairman of the Alcohol Beverage Control Board. Va.Code Ann. § 3.1–1060. State law authorizes funding for "viticulture and ecological practices and promotion, marketing, and education programs deemed necessary or advisable to accomplish the objectives set forth in this chapter." Va Code Ann. § 3.1–1061. The Commissioner of the Winegrowers Advisory Board is vested with the "power and duty," among other things, to handle the funding; to enter agreements to develop "new or improved markets or marketing methods for wine and grape products"; and to enact regulations as may be necessary to accomplish the purposes of this chapter with respect to wines and wined used or produced in Virginia Va.Code Ann. § 3.1–1062. Given the law and the stated policy; Virginia cannot claim with a "straight face" that its ban on direct shipment is for my reason other than economic protectionism.

It is the Defendants' and Intervenor's burden to prove that there exists no other means of promoting temperance, preventing diversion, and addressing the other legitimate public safety and health objectives involved. They have failed to meet this burden. They have not produced any meaningful evidence which the Court can accept as creating a genuine dispute of a material fact regarding any justification for the *discriminatory* policy. *See Waste Mgmt. Holdings, Inc. v. Gilmore,* 87 F.Supp.2d at 543; 252 F.3d 316, 341–42, (holding that the Defendants must produce sufficient evidence to prove that no nondiscriminatory alternatives exist that are adequate to protect local interests.) [42]

---

**42.** The Court even extended the discovery period by ninety days, long after the case had commenced, in response to the Defendants' and Intervenor's pleas that they had not understood that the Plaintiffs' claims applied to all alcoholic beverages as had been previously ordered and reiterated by the Court on repeated occasion. Yet, even with the additional opportunity, the Defendants and Intervenor failed to present evidence that there are no other nondiscriminatory means to promote the same core concerns supposedly promoted by the discriminatory system that is in place. Perhaps they failed to produce such evidence because if they had attempted such an offer, they would have been confronted with the daunting task of explaining why there are no

## Out–of–State Wine and Beer Direct Shipment Prohibition

A state can prohibit the direct shipment of an alcoholic beverage as long as there is no distinction based on place of origination. The in-state preference for the Virginia wine and beer industry therefore is impermissible as violative of the dormant Commerce Clause. Although it is the ban on interstate direct shipment imposed by the Virginia regulation scheme that impacts on commerce and which therefore is subject to constitutional challenge, it is the Virginia exception that is part of the scheme that causes the ban to have other than a neutral effect. Therefore, if the Virginia exception or preference can be stricken, or otherwise rendered neutral, the remaining portions of the regulatory scheme would equal in practical effect the regulatory scheme involving distilled spirits that is neutral and not subject to a strict scrutiny analysis. However, it is not clear that the non-violative portion of the statutory and regulatory scheme can be so interpreted and it is not appropriate for the Court to infer legislative will. Therefore, it is appropriate to only recommend that the constitutional challenge to the entire ban be rejected as long as the instate preference in all its various forms and applications is found to be constitutionally impermissible.

### Virginia Wine Only For Sale

One final issue [43] remains to be addressed in regard to the preference given to the Virginia wine industry where, bylaw, only ABC stores sell distilled spirits and ABC stores only sell Virginia farm wines.

The Defendants and Intervenors argue it is a permissible activity and therefore constitutional practice because the state is simply choosing which brands that it chooses to offer for sale as does any free market participant. *See Wyoming v. Oklahoma,* 502 U.S. at 459, 112 S.Ct. 789 (citing *Reeves Inc. v. Stake,* 447 U.S. 429, 436–437 (1980)).

Whether the ABC can avail itself of the "market participant exception" to the dormant Commerce Clause is not an easy question. It is correct to assert on the one hand that there is nothing in the Constitution that prohibits a state from favoring its own citizens when the state is acting as a market participant rather than a market regulator. *Hughes v. Alexandria Scrap Corp.,* 426 U.S. 794, 810, 96 S.Ct. 2488, 49 L.Ed.2d 220 (1976). Indeed, strong public policy concerns support the market participant exception from application of the Commerce Clause where each state is vested with the responsibility "as guardian and trustees for its people." *Heim v. McCall,* 239 U.S. 175, 191, 36 S.Ct. 78, 60 L.Ed. 206 (1915) (citations omitted). However, in this instance, not only does the ABC Board control the state-run monopoly on liquor distribution and act as the sole distributor and proprietor of hard liquor, it also regulates all aspects of the beer, wine and distilled spirits marketed under the ABC Act which is a comprehensive state statute with the primary purpose of controlling all alcohol distribution in the state.

---

apparent problems in achieving the same goals with the existing system allowing in-state direct shipment.

**43.** The issue regarding the prohibition against any out-of-state manufacturing or distribution source being eligible for licensure in Virginia clearly involves a neutral ban that is further protected from constitutional challenge by the legitimate interest of the state in having con-

trol over such sources which it can do only within its borders while also precluding vertical integration of producer and retailer. Moreover, it is fair to assume that the issue is rendered moot in any event by the elimination of the in-state preference for wine and beer because there would be no incentive for out-of-state license re if everyone and everything is subjected to a direct shipment ban.

Undoubtedly, the state directly participates in the market for distilled spirits through its ABC stores. However, it also maintains a monopoly by way of its regulatory power and thus competes against no one. The state is therefore not entitled to a market participant exception with respect to its monopoly on distilled spirits so that one must examine whether its limited selection of offerings of distilled spirits together with a ban on direct shipment is violative of the dormant Commerce Clause. Based on the facts and the questions before the court the monopoly in regard to distilled spirits appears neutral with respect to the treatment of in-state and out-of state product. While it is true that the ABC stores do not carry all brands of liquor a consumer may want, the stores nevertheless treat all distilled spirits alike regardless of origin. The statutory scheme is neutral because there is no in-state preference as there is with wine and beer, there are no distilled spirits licensees which the state is promoting to the disadvantage of out-of state purveyors, and, therefore, there is no facial or effective discrimination involving distilled spirits.

However, the role of the ABC and how it treats in-state wineries and off-premises beer and wine licensees is quite different. As with distilled spirits, the ABC is the exclusive regulator of wine and beer in Virginia, but it is also a purveyor of wine in Virginia.[44] Virginia law compels the ABC to sell only Virginia wine in its state liquor stores. The state is therefore both a regulator and a competitor which prevents the application of the market participant exception in regard to the state's sale of wine because the Commerce Clause acts as an "implied restraint upon state regulatory powers... involving interstate commerce." *United Bldg. & Const. v. Camden,* 465 U.S. 208, 220, 104 S.Ct. 1020, 79 L.Ed.2d 249 (1924). Though the state competes with other wine retailers—which is closer to the free market which undergirds the exception—the state's preference for in-state wine clearly has the purpose of subsidizing the local wine market to the exclusion of all others. *See New Energy Co. of Ind. v. Limbach,* 486 U.S. at 277. While the wine preference is "a discrete activity focused on a single industry," it is nonetheless a discriminatory scheme favoring local winegrowers and producers. *See Camps Newfound/Owatonna, Inc. v. Town of Harrison,* 520 U.S. at 594 (citing *Bacchus Imports, Ltd. v. Dias,* 468 U.S. at 270–271, and *West Lynn Creamery, Inc. v. Healy,* 512 U.S. at 199, to explain why discriminatory regulatory schemes designed to protect local industries cannot fall within the market participant exception as otherwise legitimate subsidies.).

Defendants argue that the state's dual role of retailer and regulator can be bifurcated—that its regulatory power is separable from its role as a market participant. (Defs.'Am. Mem. in Supp. of Mot. Summ. J. at 51; Defs.' Reply Mem. in Opp'n to Pls.' Mot. Summ. J. at 8–9). To the contrary, the ABC's dual roles as regulator and wholesaler/retailer cannot be separated. The ABC, by law, is vested with expansive regulatory and enforcement power which is intertwined with its function as the sole liquor retailer in the state. At the same time, with respect to wine, the state is a retailer competing with other retailers. State law and the ABC's own statutory regulatory power give rise to the facial discrimination against out-of-state wine products which renders its sale of only in-state wine in state liquor stores to be a per se violation of constitutional proscriptions, Furthermore, the Court need not inquire into the extent or impact of the discrimination, only whether the discrimination exists in order to conclude that the roles of regulator and market participant cannot be

---

**44.** The ABC stores *do* not sell beer of any kind regardless of origin.

separated to a sufficient extent to preserve the market participant exception for Virginia.

The state does have a legitimate interest in promoting its local products and should do so vigorously. *Hughes v. Alexandria Scrap Corp.*, 426 U.S. at 809, 816. The state, however, has not shown—nor have they offered any argument whatsoever—that there are no other nondiscriminatory means of promoting the local wine industry except through a ban on out-of-state wine sales at state liquor stores. The Supreme Court has offered ample guidance on the types of permissible subsidies and promotions in which a state may engage in advancing local concerns. *See, e.g., Camps Newfound/Owatonna, Inc. v. Town of Harrison*, 520 U.S. at 593–594 (discussing cases in which the Court upheld preferential subsidies to promote local industry or advance local concerns). The Virginia scheme is not such a subsidy, but an impermissible form of economic protectionism that is prohibited by the dormant Commerce Clause.[45]

### Possible Remedies

Having decided that in-state preferences for Virginia wine and beer are unconstitutional forms of discrimination, the Court must decide whether the related statutory provisions are severable from the rest of the ABC Act or whether the entire statutory scheme must be stricken. Plaintiffs go so far as to argue that the offensive provisions cannot be severed from Title 4.1 because the entire ABC Act is fraught with discrimination against out-of-state interests and, therefore, must be stricken. Whether unconstitutional provisions of state statutes are severable from the rest of an act is a question of state law. *Unit-*

*ed States Dept. of Treasury v. Fabe*, 508 U.S. 491, 510, 113 S.Ct. 2202, 124 L.Ed.2d 449 (1993). Under Virginia law, the court must determine whether the Virginia General Assembly would have passed the ABC Act without the preference for in-state wine and beer in order to conclude whether only certain offending sections can "be excised or whether the entire statutory scheme fails". The current version of the Act contains no severability clause manifesting the legislature's intent that should any provision of the Act be declared invalid that the rest of the Act should survive. Even where the legislature supplies such a severability provision, the Court must still determine whether the true intent of the legislature would be to pass a law absent the unconstitutional provision. *Heublein, Inc. v. Dept. of Alcoholic Beverage Control*, 237 Va. at 200, 376 S.E.2d at 81 (citing *Richmond v. Beltway Properties*, 217 Va. 376, 379, 228 S.E.2d 569, 572 (1976)). While the original bill contained substantially similar provisions as § 4.1209(A)(2) permitting retail off-premises licensees to direct ship beer and wine to consumers (and also to persons outside the state unless forbidden to do so by the law of the receiving state), the proposed bills contained no ban on out-of-state direct shipment as in the current version of the Act. (App. A to Sen. Doc. 5, sections 18(b), (c) & (h)). At that time, the law contemplated all importation of alcoholic beverages—including wine destined for local licensees—be consigned first to the Board. (*Id.*, sections 43, 58(a)-(c)). Currently, not only may off-premises licensees receive and send shipments directly, farm wineries, wineries and breweries may produce beer and wine and ship their product directly to consumers. §§ 4.1–207(1), (5);

---

45. There are several courses of action the General Assembly may take to rectify its impermissible preference for in-state wine. The ABC can do what is done now with distilled spirits by offering an array of choices (includ- ing special order items); or as with beer, not offer any wine for sale and defer to the private licensee. Of course, the decision is the legislature's in any event.

4.1–208(1), (4). These are but a few examples of developments in the ABC Act since the original inception of the law in 1933. It therefore appears that the Virginia General Assembly did, in fact, pass the offending provisions separately after passing the comprehensive Act regulating alcohol without direct shipment preferences. *Heublein, Inc. v. Dept. of Alcoholic Beverage Control*, 237 Va. at 200, 376 S.E.2d at 81 (citing *Bd. of Sup. of James City County v. Rowe*, 216 Va. 128, 147, 216 S.E.2d 199 (1975)).

Fortunately, there is also, again, guidance for the Court from the most authoritative source for interpreting an issue concerning Virginia law—the Virginia Supreme Court. Indeed, citing the Acts of Assembly, 1934, Chapter 94, § 68, the Virginia Supreme Court has held that other unconstitutional provisions of the Act are severable. *Booth v. Virginia*, 197 Va. 177, 88 S.E.2d 916, (1955) (striking down on due process grounds the statutory prohibition on alcohol possession by "an improper person" by holding the language to be unconstitutionally vague). It is therefore clear that the unconstitutional provisions can be segregated from the Act as a whole and while the Plaintiffs object to the constitutionality of the entire Act's closed system, the case law on which this opinion is based does not require the Court to recommend that the entire statutory scheme be declared unconstitutional. Nor does the Court choose to do so.

## Conclusion

Virginia law authorizes Virginia wineries, breweries and off-premise licensees to direct ship their product to anyone, anywhere, if it is otherwise legal to do so.[46] At the same time, Virginia law discriminates against out-of-state sources by prohibiting them the same ability to ship directly to Virginia purchasers. In addition, Virginia law permits only Virginia-produced wine to be sold in its state-operated stores while it regulates the distribution of all wine sold and, distributed throughout the state. Such an obvious preference for equally-obvious economic advantage violates fundamental principles involving the Commerce Clause, even taking into consideration the nature of the goods involved and the impact of related constitutional and statutory mandates,

The Court does not relish its duty to recommend that the portions of the ABC Act that violate the dormant Commerce Clause be declared unconstitutional, thereby eliminating the authority obviously intended by the legislature to permit Virginia farm wineries, breweries, and off-premise licensees to direct ship.[47] However, there is no alternative, except to also recommend that the District Court stay a final order pending further appeal because it is less than clear that there would automatically be a statutory mechanism in place if the violative language were stricken from the various provisions, e.g., "other than wine or beer," for Virginia wine and

---

**46.** Whether a foreign state permits the direct importation of Virginia wine and beer products does not negate the impact of the Virginia scheme on interstate commerce.

**47.** The qualifying phrases in such sections as § § 4.1–310 ("other than wine or beer"), § § 4.1–207(1), (3), (4), (5); § 4.1–208(6); and § 4.1–209(2), together with implementing Board regulations that authorize or otherwise relate to the instate preference for direct shipment of Virginia wine, are examples of the offending provisions which must be stricken.

Given the multitude and interrelationship of relevant statutes and regulations, it is not clear to the Court at present that the remedy is simply to strike offending language. Perhaps the submissions of the parties in their anticipated objections to this report will provide the clarification necessary to render a stay unnecessary or otherwise inappropriate. However, this Court prefers to await such clarification and defer to the district court before concluding that the solution is so readily available.

beer sources to know what to do with their product if its direct shipment is prohibited.[48] Presumably, the legislature would want to address the issues involved as it has over time. In doing so, the Virginia General Assembly may choose to abide by the elimination of the instate preference if the Court's recommendation is adopted and clarify its statutory mandate so as to clearly subject Virginia farm wineries, breweries and off-premise licensees to the same restrictions as apply to all imported alcoholic beverages. On the other hand, the legislature may prefer to eliminate the ban on direct shipments of all alcoholic beverage products from whatever source altogether by following the lead of the state's current governor, the Honorable James S. Gilmore, III, who as Chairman of the Advisory Commission on Electronic Commerce espouses the concept of no state taxation on interstate electronic commerce activities.[49] In any event, that decision is for the legislature to render and a stay of any final order declaring the subject provisions unconstitutional will allow sufficient time for the legislature, if it so chooses, to fashion a constitutionally-sound legislative remedy.

It is therefore recommended that the Plaintiffs' Motions for Summary Judgment and declaratory relief be GRANTED to the extent that those portions of the Virginia statutory scheme that create an instate preference for wine and beer by permitting direct shipment of product to the consumer without having to first pass through a licensed wholesaler or retailer and requires that only Virginia-produced wine be marketed in state-owned and operated stores be declared unconstitutional as violative of Article I, section 8, clause 3 of the United States Constitution; that the remaining portion of the Plaintiffs' motions seeking to declare as unconstitutional the ban on direct shipments from out-of-state on beer, wine and distilled spirits be DENIED; and that the reciprocal portions of the Defendants' and Intervenors' motions for summary judgment be DENIED and GRANTED accordingly.

Let the Clerk forward a copy of this report and recommendation to the Honorable Richard L. Williams, Judge, United States District Court, and to all counsel of record. Because of the complexity of the issues and the length of this report and recommendation, counsel are granted an enlargement of time to August 29, 2001, pursuant to Fed.R.Civ.P. 6(a) and the local rules of this Court, to submit any written objections to the recommendation as provided for in 28 U.S.C. § 636(b)(1)(C).

It is so Ordered.

---

**48.** The violative requirement restricting wine sales in ABC stores to Virginia products does not present such a problem as addressed in footnote 45.

**49.** The Commission was appointed by special act of Congress and issued its report and recommendation in April 2000. ADVISORY COMM'N ON ELEC. COMMERCE, REPORT TO CONG., APRIL, 2000.